A00A2491. STEPHENS et al. v. GREENSBORO PROPERTIES, LTD., L.P. et al.
(544 SE2d 464)

PHIPPS, Judge.

Linda and Freddie Stephens lived with their 14-year-old son Martrieal in an apartment complex owned by Greensboro Properties, Ltd., L.P., and Greensboro Properties, Ltd., L.P., Phase II, ("Greensboro Properties") and managed by Investors Management Company of Valdosta, Inc. (IMC). Stanley Scott also lived in the apartment complex, was employed there as maintenance man, and assumed certain other responsibilities.

Scott shot and killed Martrieal Stephens on the premises. As a result, the Stephenses brought this wrongful death action against Scott, Greensboro Properties, and IMC. The Stephenses seek to hold Greensboro Properties and IMC directly liable for Scott's actions under various negligence theories, and they seek to impose vicarious liability under the doctrine of respondeat superior. The Stephenses appeal the trial court's grant of summary judgment to Greensboro Properties and IMC. Because there is evidence to support the Stephenses' claim against Greensboro Properties and IMC under one of the theories asserted, we reverse.

We review de novo a trial court's grant of summary judgment.[1] To establish an entitlement to summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[2] The burden on the moving party may be discharged by pointing out by reference to the record that there is an absence of evidence to support the nonmoving party's case.[3] Here, the evidence shows the following.

Scott applied for residency in the apartment complex in July 1996. The complex was financed and operated as a low income housing development and, as such, was subject to various rules and regulations of the Farmers Home Administration (FmHA). When Scott applied to become a tenant, IMC's policy was to disapprove any residency application filed by a person convicted of a felony within the prior five years. Approximately six months later, IMC extended its exclusionary policy to any convicted felon.

Although Scott truthfully stated on his residency application that he had not been convicted of any felony within the prohibited five-year period, an authorized check of his background disclosed a history of arrests and convictions of violent crimes from 1980 through 1989.[4] Resident manager Pat Naramore testified that after conferring with property manager Debbie Peaster and giving Scott an opportunity to explain the circumstances surrounding his criminal record, she approved his residency application.

After becoming a resident, Scott was hired as the apartment complex's maintenance man and paid based on the number of hours he spent doing maintenance work. He was on call 24 hours a day. At times, he responded to tenant requests by performing repair work in the middle of the night, even after he had been drinking.

Because Scott both lived in and worked for the apartment complex, tenants also complained to him about problems such as other tenants playing music too loudly or making other disturbing noises. With Naramore's and Peaster's knowledge and consent, Scott resolved these complaints. He testified that he was not paid for doing this, but did so out of a sense of appreciation for being provided with

---

[1] *Bandy v. Mills*, 216 Ga. App. 407 (454 SE2d 610) (1995).

[2] OCGA § 9-11-56 (c).

[3] *Jackson v. Post Properties*, 236 Ga. App. 701 (513 SE2d 259) (1999).

[4] Scott's criminal record consists of an arrest for pointing a gun at another in 1980; an arrest for assault and simple battery with charges dismissed in 1981; an arrest for criminal trespass also in 1981; a conviction of aggravated assault in 1982; an arrest for rape with the grand jury's return of a no bill of indictment again in 1982; arrests for simple battery, and for making terroristic acts and threats, with the prosecution being nolle prossed in 1983; two arrests for simple battery with dismissal of the charges in 1984; a conviction of aggravated assault in 1984; and a conviction of simple battery in 1989.

a job and place to live.

After a child in the apartment complex gave Scott drugs which were turned over to Naramore and then the police, Peaster encouraged Scott to "keep up the good work." According to Scott, it later became known that he had "ratted" on some drug pushers residing in the apartments, and this led to threats against him. Unbeknownst to Naramore or Peaster, Scott started carrying a handgun for protection.

On a Saturday in July 1997, Scott performed no maintenance work at the apartments, but instead left the complex with friends and drank from morning until late afternoon. After returning home and taking a nap, he awoke that night. Although still intoxicated, Scott went to Darrell Miller's apartment to ask Miller to give him a ride to the store so that he could purchase beer. The two were drinking buddies, and Scott intended to share the beer with Miller. Incidentally, Scott thought Miller was a drug dealer, and he testified that he was utilizing his friendship with Miller to gain information concerning his suspected drug activities.

As Scott approached Miller's apartment to ask for a ride, he had $400 in his hand. A number of people, including the decedent, were congregated in the parking lot. Scott testified that he knew the decedent and that they had sometimes engaged in a sport called slap boxing. When the decedent saw Scott approaching Miller's apartment that night, he offered to slap box Scott for the money he was holding. Without responding, Scott pulled his handgun from his pocket and pointed it at the decedent. The gun discharged, killing him. Scott testified that he bore the decedent no animosity and that the gun had discharged accidentally.

No evidence was presented showing any similar incidents of violence at the apartment complex. The decedent's parents were aware that Scott carried a gun. They did not report it to IMC, but the decedent's mother testified that she warned him that Scott was armed. About six months before the decedent was killed, other residents of the apartment complex talked to Naramore about Scott's past criminal record and past reputation for violence in the community and told her that she needed to keep an eye on him. The decedent's mother testified that she had seen Scott acting physically abusive toward boys living in the apartment complex. She also related that a week or two before her son was killed, he came home with serious neck and facial injuries. Through hearsay testimony concerning out-of-court statements made by a friend of the decedent's, the Stephenses sought to show that Scott was the attacker.

1. The Stephenses charge Greensboro Properties and IMC with negligence, based on general principles relating to premises liability.

As to this theory,

> [t]he general rule is that a landlord does not ensure a tenant's safety against third-party criminal attacks, and that any liability from such attacks must be predicated on a breach of duty to "exercise ordinary care in keeping the premises and approaches safe." [Cits.] If a proprietor has "reason to anticipate a criminal act," then the proprietor has "'a duty to exercise ordinary care to guard against injury from dangerous characters.'" [Cit.] The basis of liability is a proprietor's superior knowledge of the existence of a condition that may subject an invitee to an unreasonable risk of harm. [Cit.][5]

(a) Greensboro Properties and IMC assert that under cases such as *Sturbridge Partners v. Walker*[6] and *FPI Atlanta, L.P. v. Seaton*,[7] a tenant cannot hold a landlord liable for a third-party criminal attack unless a substantially similar incident of which the landlord was aware previously occurred on the premises. Because there is no evidence of any such incident here, Greensboro Properties and IMC argue that they are entitled to summary judgment. This argument is without merit.

Although the cited cases do impose a duty on a landlord to guard against crime when the landlord has reason to anticipate a criminal act from prior experience with substantially similar types of crime occurring on or near the premises, these cases should not be interpreted as requiring that a plaintiff must *always* show the existence of a prior similar incident to establish that a danger was foreseeable.[8]

> Evidence of a prior substantially similar act is one way to establish notice and foreseeability, and in most cases it will be the only possible way to do so. It is conceivable, however, that a danger could be so obvious that an issue for jury determination could exist regarding notice and/or foreseeability despite the absence of a prior similar incident on those premises.[9]

Evidence has been presented showing that the management company allowed Scott to become both a resident and an employee of the apartment complex and that they authorized him to engage in

---

[5] *Johnson v. Holiday Food Stores*, 238 Ga. App. 822, 823 (1) (520 SE2d 502) (1999).
[6] 267 Ga. 785 (482 SE2d 339) (1997).
[7] 240 Ga. App. 880, 882 (1) (524 SE2d 524) (1999).
[8] See *Wallace v. Boys Club of Albany*, 211 Ga. App. 534, 536, n. 2 (439 SE2d 746) (1993).
[9] Id.

security-related activities which might reasonably result in altercations with co-tenants, notwithstanding knowledge of his long history of convictions and arrests for numerous violent crimes. Under the circumstances, it is for a jury to decide whether an assault such as the one committed by Scott on his co-tenant Stephens was reasonably to be anticipated and whether IMC failed to exercise ordinary care in guarding against such an occurrence. There is evidence to support a recovery by the Stephenses under their theory of premises liability.

(b) There is no merit in Greensboro Properties' and IMC's arguments that they are entitled to summary judgment because the decedent, with equal or superior knowledge of the risk, failed to exercise ordinary care for his safety and that he assumed the risk of his injuries.

In support of their position, Greensboro Properties and IMC cite *Rappenecker v. L.S.E., Inc.*[10] and *Howell v. Three Rivers Security*.[11] Those cases are distinguishable. In both, it was undisputed that the plaintiffs voluntarily exposed themselves to the risk that individuals hostile toward them would do them harm. In this case, there is evidence from which the jury could find that the decedent approached Scott in the absence of any mutual hostility to solicit his participation in a sporting activity in which they had previously engaged. Whether the Stephenses' 14-year-old son, by challenging Scott to the game of slap boxing, failed to exercise ordinary care for his own safety and assumed the risk of being shot is a question for the jury.[12]

(c) The fact that the shooting occurred in a parking lot accessible to the general public does not bar the Stephenses' recovery. Unquestionably, Scott and the decedent were on the premises of the apartment complex. There is abundant evidence that Scott would not have been there but for his residency in the complex.[13]

2. We, however, find no basis for a recovery by the Stephenses based on theories that Greensboro Properties and IMC (a) are chargeable with negligence per se by reason of violation of FmHA regulations applicable to operation of the apartment complex, and (b) committed simple negligence by violating their own tenant selection policies.

(a) We have held that violation of a statute or ordinance which

---

[10] 236 Ga. App. 86, 87 (1) (510 SE2d 871) (1999).

[11] 216 Ga. App. 890 (456 SE2d 278) (1995).

[12] See generally *Atlanta Gas Light Co. v. Gresham*, 260 Ga. 391, 392 (3) (394 SE2d 345) (1990) (because a child may be unable to appreciate a danger and have equal knowledge of a hazard, defendant may be held to a higher standard of care); *Stegall v. Central Ga. Elec. Membership Corp.*, 221 Ga. App. 187, 190 (2) (470 SE2d 782) (1996) (except in plain, palpable, and undisputed cases where reasonable minds cannot differ, questions of contributory negligence and assumption of risk are for the jury).

[13] Cf. *Harvey Freeman & Sons, Inc. v. Stanley*, 259 Ga. 233 (1) (378 SE2d 857) (1989).

creates a duty requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks may be considered negligence per se.[14] One of the regulations relied on by the Stephenses authorizes the landlord of a low income housing project to reject applicants who would pose a direct threat to the health and safety of other individuals, but imposes no duty on the landlord to do so. It follows that IMC could not have violated that regulation so as to be chargeable with negligence per se. Another regulation upon which the Stephenses rely does impose a duty upon the landlord requiring compliance with certain codes and regulations, but there is no evidence of noncompliance with any of these codes or regulations.

(b) Similarly, there is no evidence that IMC violated any of its own policies in allowing Scott to become a resident of the complex. IMC complied with its policies by having Scott complete a residency application and by conducting a check of his background. A determination was made that he was not barred from becoming a tenant, in that none of his felony convictions had occurred within the previous five-year period. The policy requiring rejection of an application by any convicted felon was not adopted until later.

3. We find no basis for a recovery by the Stephenses either under the theory of respondeat superior or under the theory of negligent hiring and retention.

> The doctrine of respondeat superior is codified in [OCGA] § 51-2-2 which states: "Every person shall be liable for torts committed by his wife, his child, or his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily." The recognized legal corollary to this doctrine is that once an agent or employee departs or steps aside from his employment and undertakes an act purely personal in nature, the employer is not liable for that act. [Cit.][15]

Likewise, we have held that the theory of negligent hiring and retention is "conceptually inapplicable when the tortious conduct was committed outside the scope of employment. [Cit.]"[16] Unquestionably, when Scott brandished a weapon and pointed it at the decedent after

---

[14] *Generali — U. S. Branch v. Southeastern Security Ins. Co.*, 229 Ga. App. 277, 280 (2) (b) (493 SE2d 731) (1997).

[15] *Cummings v. Walsh Constr. Co.*, 561 FSupp. 872 (S.D. Ga. 1983); see *Brown v. AMF Bowling Centers*, 236 Ga. App. 277 (1) (511 SE2d 619) (1999).

[16] *Dester v. Dester*, 240 Ga. App. 711, 715 (7) (523 SE2d 635) (1999).

being challenged to a game of slap boxing, he undertook acts personal in nature and stepped aside from any employment by the apartment complex.

For reasons given in Division 1, however, the trial court erred in awarding summary judgment to Greensboro Properties and IMC.

*Judgment reversed. Johnson, P. J., and Smith, P. J., concur.*

DECIDED JANUARY 5, 2001 —
RECONSIDERATION DENIED JANUARY 24, 2001.

*David G. Kopp, Jesse Copelan, Jr., for appellants.*
*Blasingame, Burch, Garrard, Bryant & Ashley, E. Davison Burch, Matthew A. Moseley, for appellees.*