A03A1401. TGM ASHLEY LAKES, INC. et al. v. JENNINGS et al.
(590 SE2d 807)

ADAMS, Judge.

This is an appeal by the defendants from a final judgment entered in a wrongful death action. After review, we find no error mandating a new trial and affirm.

Danielle Jennings was strangled to death in her own apartment by a maintenance employee of TGM Associates, L.P., her landlord. Subsequently, Phillip and Sherry Jennings, as the co-administrators of their daughter's estate, as the next friends of Tristan Jennings (the decedent's minor son), and as her surviving parents, sued TGM Ashley Lakes, Inc., TGM Associates, L.P., Maria Caruthers, and Beverly Glover.

Ashley Lakes is an apartment complex located in Gwinnett County consisting of 240 units and 12 buildings. At the time of the murder, TGM Ashley Lakes, Inc. owned the apartment complex; TGM Associates, L.P. was the management company; Caruthers was the property manager; and Glover was the leasing manager. The Jenningses brought claims for negligent hiring and retention, failure to provide adequate security and failure to warn, negligence, nuisance, and wrongful death. Claiming that the conduct of the defendants evidenced a wilful and wanton disregard for the safety of others, they sought punitive damages. Following trial, the jury returned a verdict in excess of $13 million for wrongful death and for pain and suffering. The jury also awarded punitive damages of $2.5 million, an amount later reduced to $250,000 based upon the jury's finding that there

was no specific intent to harm. Following the jury verdict, entry of judgment, and the denial of the motion for new trial, TGM and the other defendants (collectively "TGM") filed this appeal alleging seven claims of error.

When viewed in the light most favorable to the verdict, the evidence showed that Danielle Jennings, her boyfriend, and her two-year-old son, Tristan, moved into the Ashley Lakes apartment complex in November 1998. On March 15, 1999, Jennings was found strangled to death in her apartment. Approximately six months earlier, in September 1998, the apartment complex had hired Calvin Oliver, a convicted felon and recidivist, as a maintenance worker and gave him full access to all the residents' keys. On the day of the murder, Oliver entered Jennings' apartment while she was at work and killed her when she came home at lunchtime. He was later arrested and convicted for the victim's murder and the burglary of her apartment.

Glover, the leasing manager, had recommended Oliver for employment as a maintenance worker. Although Oliver told Glover that he had been in trouble with the law and had been in jail, Glover did not check into his criminal history or disclose that information to her supervisors. In fact, Oliver had spent most of his adult life in prison or on parole. He had felony convictions for rape, armed robbery, robbery, robbery by force, larceny, credit card theft, and at least three residential burglaries. Oliver was also the subject of an outstanding arrest warrant for a "failure to appear" in a burglary case involving the theft of personal checks. Caruthers admitted that given his background, Oliver was not a suitable employee.

It is undisputed that TGM never attempted to determine whether Oliver had any prior criminal convictions. Despite knowing that another TGM region required criminal background checks on prospective employees, Caruthers did nothing of this nature. Instead, Caruthers, who was directly involved in the hiring decision, testified that she wrote "N/A, not applicable" next to the space for criminal history check on Oliver's employment paperwork that she sent to TGM's office in New York. TGM also failed to obtain three letters of reference for character and work experience required by TGM's hiring policies.

Donna Destefano, the TGM regional manager then responsible for Ashley Lakes, admitted that the TGM employment application itself was flawed and did not accomplish the goal of determining whether a potential employee had been convicted of a crime. She conceded that the property manager, district manager, and regional manager did not do their respective jobs in the process of hiring Oliver. She admitted that TGM violated its own policies on obtaining

and checking references, which, if followed, would have prevented his hiring.

Between June 1998 and March 1999, key control policies were routinely violated on a daily basis, and there were problems with missing keys to residents' apartments. Only the manager and assistant manager were supposed to have keys to the maintenance key lock box. At the time of his arrest, Oliver had keys to the maintenance lock box on both his personal key ring and his work key ring. In addition, the maintenance office had a key-duplicating machine, but no records were kept on its use. When pointedly asked whether TGM had protected the keys to people's homes, Destefano admitted that TGM had not done so.

Between the time that TGM hired Oliver and the murder, residents of Ashley Lakes reported ten or more unforced entries and burglaries of their apartments. Glover admitted knowing about certain unforced entries in late 1998 and early 1999. Likewise, Caruthers testified that she knew about this rash of unforced entries after Oliver was hired. The evidence shows that in February and early March, residents reported the theft of cash, jewelry, guns, computers, blank personal checks, and other valuables from their apartments — thefts that occurred without any sign of forced entry.

One victim discovered cash and checks missing and contacted an assistant manager in mid-December 1998. She lived on the third floor and noted no sign of forced entry, and she asked whether TGM ran criminal background checks for their workers because, "I was positive that an employee was the one that took the things." Another resident was home sick one day in mid-February and walked out to her kitchen only to discover Oliver inside her home, unbidden, ostensibly there to fix a dishwasher that was not broken. She asked him to leave, and she told management that checks were stolen from her apartment and "that I had caught Calvin Oliver in my apartment." Her roommate also had his checkbook stolen. In response, management changed her locks. On February 23, a resident of the same building where Jennings lived reported some personal checks stolen but no sign of forced entry. Caruthers forwarded reports on these incidents to TGM's New York office on or about February 24, 1999.

In late February 1999, about two weeks before the murder, Caruthers conducted a staff meeting to discuss the pattern of unforced entries and burglaries and to inform the staff that some residents suspected an employee. Oliver attended the meeting. Despite having actual knowledge about the criminal activity, management still did not undertake criminal background checks of Oliver or anyone else, and it continued to allow employees unfettered access to keys. Nor did management alert residents about the criminal

activity or the ongoing breaches in security in the apartment complex.

On March 8, a week before the murder, two other residents reported that they were missing cash, with no sign of forced entry and no pending work orders or pest control service for those apartments.

1. (a) TGM contends that the trial court should have directed a verdict on the claim of negligent hiring and retention. "A directed verdict is authorized only when there is no conflict in the evidence on any material issue and the evidence introduced, with all reasonable deductions, demands a particular verdict." (Footnote omitted.) *H. J. Russell & Co. v. Jones*, 250 Ga. App. 28-29 (550 SE2d 450) (2001).

An employer breaches its duty of care by hiring an employee "who is not accustomed to act with due care." (Citations and punctuation omitted.) *Henderson v. Nolting First Mtg. Corp.*, 184 Ga. 724, 737 (193 SE 347) (1937). The causation element requires showing that, given the employee's dangerous propensities, the victim's injuries should have been foreseen as the natural and probable consequence of hiring the employee. See *Harvey v. McLaughlin*, 198 Ga. App. 105, 107 (1) (a) (400 SE2d 635) (1990); *Edwards v. Robinson-Humphrey Co.*, 164 Ga. App. 876, 881 (3) (298 SE2d 600) (1982); *Henderson*, 184 Ga. at 737. Finally, liability does not attach if the employee committed the tort in a setting or under circumstances wholly unrelated to his employment. See *Harvey Freeman & Sons, Inc. v. Stanley*, 189 Ga. App. 256, 257-258 (1) (375 SE2d 261) (1988), aff'd in part and rev'd in part on separate grounds, 259 Ga. 233 (378 SE2d 857) (1989); *Lear Siegler, Inc. v. Stegall*, 184 Ga. App. 27, 28-29 (360 SE2d 619) (1987).

With regard to negligent hiring, the manager who recommended Oliver for employment as a maintenance worker knew that Oliver had been in trouble with the law, including time spent in jail. This simple fact raises a jury issue of whether TGM should have further inquired into Oliver's past criminal record prior to hiring him. See, e.g., *Jester v. Hill*, 161 Ga. App. 778, 783-784 (2) (288 SE2d 870) (1982) (employee's poor general reputation in his industry raised jury issue regarding adequacy of pre-employment background check to discover employee's propensity for fraud). See also *Harvey Freeman*, 259 Ga. at 234 (2) (facts raised jury issue of whether employer should have known of employee's dangerous propensities); *Cunningham v. Hodges*, 150 Ga. App. 827, 830 (5) (B) (258 SE2d 631) (1979) (based on knowledge of certain prior acts, a jury could conclude employer had notice of employee's alleged propensity for negligence with fire).

The case is stronger for negligent retention. TGM learned that a series of unforced entries and burglaries had occurred at the premises since Oliver had been hired; that some residents suspected an

employee; and that Oliver had been discovered in one apartment without authorization. Also, one resident had even suggested that criminal background checks be performed because she was positive that an employee was the culprit. These facts raised an issue for the jury of whether TGM, acting reasonably, should have taken additional steps to investigate the criminal background of their employees, including Oliver. See *Harvey Freeman*, 189 Ga. App. at 258 (2) (a).

The jury was also authorized to conclude that Jennings' injuries were foreseeable based on Oliver's criminal past. It has been said that in order to conclude that the injuries were foreseeable, they must be substantially similar or related to the incidents found in the employee's background. See *Walter Champion Co. v. Dodson*, 252 Ga. App. 62, 63-64 (1) (555 SE2d 519) (2001); *Harper v. City of East Point*, 237 Ga. App. 375, 376 (2) (515 SE2d 623) (1999). But the Supreme Court has explained that one need not have foreseen the particular consequences that occurred or the precise injuries sustained by the plaintiff. *Henderson*, 184 Ga. at 737. " 'It is sufficient if, by exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.' [Cits.]" Id.

Oliver's past included felony convictions for rape at knifepoint, armed robbery, larceny, robbery by force, and at least three residential burglaries. These incidents show a propensity for breaking into private property and violence. A jury was authorized to conclude that a violent attack on a tenant of the apartment complex was foreseeable.

(b) TGM contends that it cannot be liable for negligent hiring because the trial court dismissed the claim of respondeat superior. TGM argues that where there is no respondeat superior liability because the employee acts outside the scope of his employment, a negligent hiring or retention claim is "conceptually inapplicable." We disagree and must overrule or disapprove of language used in three cases.

It has long been the law of this state that a negligent hiring and retention claim can be based on a tort that occurred *outside* of the scope of employment:

> The question is not whether the servant was acting within the scope of his authority, but whether in view of his known characteristics such an injury by him was reasonably to be apprehended or anticipated by the proprietor. [Cit.]

*Henderson*, 184 Ga. at 736. With regard to tortious conduct, a claim of negligent hiring and retention is very similar to a claim of prem-

ises liability. " 'The presence of a mischievous human being on premises may constitute the danger against which the law requires of the occupant reasonable care to protect his invitee.' [Cits.]" Id. Thus, it is the dangerous nature of the person in general, not simply the person acting within the scope of his duties, that is a concern. " 'Where a servant departs from the prosecution of his business and commits a tort while acting *without the scope* of his authority, the person employing him may still be liable if he failed to exercise due care in the selection of his servant.' " (Citation omitted; emphasis supplied.) Id. at 737.

In *Lear Siegler*, 184 Ga. App. 27, this Court attempted to define the outer limits of liability for negligent hiring and retention for torts committed by the employee on the public in general. In that case, an employee had a car accident under the influence of alcohol during his morning commute to work, and a question was raised as to whether the employer should have known of the employee's past bad driving record. This Court held that the theory of negligent hiring was "conceptually inapplicable" because a review of the case law showed that in each prior case involving negligent hiring, "at the very least the tortious act occurred during the tortfeasor's working hours or the employee was acting under [the] color of employment." (Citations omitted.) Id. at 28. The Court concluded,

> We decline to extend the parameters of the cause of action for negligent hiring so as to require every business whose employees drive to work to investigate those employees' driving records before hiring, or expose themselves to liability.

Id. at 28-29. In other words, without more, an employee's regular commute is not considered to be under color of employment, and therefore, the cause of action does not extend to torts committed on members of the public during an employee's commute.

In *Dester v. Dester*, 240 Ga. App. 711 (523 SE2d 635) (1999), this Court incorrectly construed *Lear Siegler* to mean that there can be no liability for negligent hiring and retention if the tort is committed outside the scope of employment. As stated in *Dester* regarding *Lear Siegler*, "we held that the theory of negligent hiring was conceptually inapplicable when the tortious conduct was committed outside the scope of employment." (Citation omitted.) Id. at 715 (7). Thus, *Dester* equated the concept of scope of employment with the phrase "during working hours or under color of employment." The cases of *Spencer v. Gary Howard Enterprises*, 256 Ga. App. 599, 601 (568 SE2d 763) (2002), and *Stephens v. Greensboro Properties*, 247 Ga. App. 670-671 (544 SE2d 464) (2001), have cited with approval the above statement from *Dester*.

That *Lear Siegler* did not so hold is apparent from the fact that in three of the six cases cited in support of its holding, the torts were committed, at least in part, outside the scope of employment but still within the tortfeasor's working hours or under the color of employment. See *Slaton v. B & B Gulf Svc. Center,* 178 Ga. App. 701, 702 (2) (344 SE2d 512) (1986); *Southern Bell Tel. &c. Co. v. Sharara,* 167 Ga. App. 665 (1) (307 SE2d 129) (1983); *Edwards,* 164 Ga. App. at 879 (3).

Moreover, the limitation found in *Lear Siegler* simply shields employers from liability for torts that their employees commit on the public in general, that is to say, people who have no relation to or association with the employer's business. See *Harvey Freeman,* 189 Ga. App. at 257 (1). In *Harvey Freeman* it was held that where there is a relationship, such as landlord-tenant, between the employer and the tort victim, the theory of negligent hiring does apply to employers whose employees commit torts outside the scope of employment. Id. That is so because an employer's duty extends to all persons who come into contact with the employee/tortfeasor as a result of their relationship to the employer. Id. The cases of *Lear Siegler* and *Harvey Freeman* establish the sound principle that even for employers who should have known of the dangerous propensities of an employee, they will not be liable if the employee acts on those propensities in a setting or under circumstances wholly unrelated to his employment.

For the above reasons, *Dester,* 240 Ga. App. 711, must be overruled to the extent that it holds that a claim of negligent hiring and retention is conceptually inapplicable when the employee has committed a tort outside of the scope of employment. To the extent that they followed this holding in *Dester, Spencer,* 256 Ga. App. 599, and *Stephens,* 247 Ga. App. 670, also are overruled.

2. TGM contends that the trial court should have directed a verdict on the claim of premises liability, and it primarily argues that it cannot be liable unless it is shown that it had actual knowledge that Oliver was a violent criminal. We disagree.

OCGA § 51-3-1 imposes a nondelegable duty upon a landowner to keep his premises in a reasonably safe condition, and a landowner must use ordinary care to do so. *Hickman v. Allen,* 217 Ga. App. 701 (458 SE2d 883) (1995). A landowner can be liable for third-party criminal attacks if the landowner has reasonable grounds to apprehend that such a criminal act would be committed but fails to take steps to guard against injury. *Walker v. St. Paul Apts.,* 227 Ga. App. 298 (489 SE2d 317) (1997); *Confetti Atlanta v. Gray,* 202 Ga. App. 241, 242 (414 SE2d 265) (1991); *Lau's Corp. v. Haskins,* 261 Ga. 491, 492 (405 SE2d 474) (1991). Accordingly, constructive knowledge of danger is sufficient.

Here, the jury could find that given the same facts cited above in

support of the negligent hiring and retention claim, TGM had reasonable grounds to apprehend that additional criminal activity would occur on the premises. Yet, TGM did nothing to alert the residents of Ashley Lakes and little to remedy the situation.

Second, the jury was authorized to find that the attack on Jennings was foreseeable.

> In determining whether previous criminal acts are substantially similar to the occurrence causing harm, thereby establishing the foreseeability of risk, the court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question.

*Sturbridge Partners v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997). The question of reasonable foreseeability of a criminal attack is generally for a jury's determination. Id. In *Sturbridge*, the Supreme Court held that the owner's knowledge of two or three unforced, daytime burglaries at an apartment complex was sufficient to create a jury issue about whether it was reasonable to anticipate that an unauthorized entry of an occupied apartment might lead to personal harm to a tenant. Id. at 787. Compare *Doe v. Prudential-Bache/A. G. Spanos Realty Partners*, 268 Ga. 604 (492 SE2d 865) (1997).

Here, in addition to a series of unforced entries and burglaries since Oliver had been hired, TGM knew that some residents suspected an employee and that Oliver had been discovered in one apartment without authorization. See also *Woodall v. Rivermont Apts.*, 239 Ga. App. 36 (520 SE2d 741) (1999) (extent of prior crime may indicate fundamental problems with security, thus making risk of violent crime more foreseeable). Because the record contains evidence to support the jury's verdict, the denial of the motion for directed verdict on the premises liability claim was proper.

3. TGM asserts that the trial court erred in its instruction to the jury on the claims for negligent hiring and retention and premises liability.

(a) TGM first contends that the court failed to charge that in a negligent hiring case the plaintiff must show that the defendant was aware of the employee's dangerous propensity to engage "in the particular conduct which caused the injury. Proof of such propensity must consist of evidence substantially related to the injury-causing conduct." See *Walter Champion*, 252 Ga. App. at 63-64 (1). This point goes to the issue of causation and the foreseeability of the tort based on the employee's background.

In addition to charging on an employer's duty in connection with

hiring and retaining employees, the court fully charged the jury on the basics of tort law, including that a claim requires a showing of duty, breach, proximate cause, and damages, and the court gave a lengthy explanation of proximate cause. The court included that a defendant may only be held liable for a negligent act that causes foreseeable injuries:

> A defendant may be held liable for injury where that person commits a negligent act which puts other forces in motion or operation, which results in the injury, and when such other forces are the natural and probable result of the act which the defendant committed and which reasonably should have been foreseen by the defendant. When the injuries could not reasonably have been foreseen as the natural, reasonable, probable result of the negligent act, then there can be no recovery.

"On appellate review a challenged jury charge must be considered as a whole, rather than in isolated segments." *Whitehead v. Cogar*, 180 Ga. App. 812, 813 (1) (350 SE2d 821) (1986). As stated above, a claim of negligent hiring requires that the victim's injuries should have been foreseen as a probable or natural consequence of hiring the employee. See *Harvey*, 198 Ga. App. at 107 (1) (a); *Edwards*, 164 Ga. App. at 881. The case of *Walter Champion* merely offers a more specific explanation of foreseeability. Accordingly, we cannot say that the court committed reversible error because the jury was fully instructed on the necessity of showing that the injuries were foreseeable based on the negligent conduct.

(b) TGM contends that the court confused the jury by charging that they could find TGM negligent in hiring an employee who was "not suited" for the particular employment. But that charge immediately followed a charge that made clear that liability was based on showing that the employer knew or should have known that the employee had dangerous propensities. Finally, there was testimony by TGM that because of his dangerous criminal background, Oliver was not suited to be a maintenance man who had access to tenants' apartments. We cannot say that the charge as a whole constitutes reversible error.

(c) Finally, TGM contends that the following charge was improperly given:

> The plaintiffs are not required to present evidence that the same severity of criminal attack must have previously occurred on the defendants' premises in order to show that

the danger which resulted in the murder of [Jennings] could have been foreseeable.

TGM essentially contends that the charge was not applicable to the claim of negligent hiring and that the court failed to make clear that the charge applied to the claim of premises liability.

The charge was a correct statement of the law with regard to premises liability. See *Sturbridge Partners*, 267 Ga. at 786. Furthermore, we do not find any objection by TGM to the positioning of the charge in the charge as a whole.

4. TGM claims that the trial court erred in refusing to direct a verdict on the claim for punitive damages. "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b).[1] But the transcript contains sufficient clear and convincing evidence to create a jury issue on whether TGM displayed a conscious indifference to the possibility that an underinvestigated employee was involved in a series of crimes that could foreseeably lead to violent results for one of its tenants.

The facts show that Glover knew Oliver had been in trouble with the law but kept silent; that TGM did not completely follow its hiring policies; that the TGM hiring process was not designed to determine whether a potential employee had been convicted of a crime; that the property manager, district manager, and regional manager did not do their respective jobs in the process of the hiring of Oliver; that apartment key control policies were routinely violated; that TGM knew that they had a recent series of unforced entries and robberies; that some tenants suspected an employee and one suggested criminal background checks; that Oliver had been caught in an apartment on an unauthorized basis; and that despite all this, management still did not undertake criminal background checks of the small number of employees, control access to the keys, or alert residents to the situation.

5. The defendants contend that the trial court erred by denying, over objection, their right to open and conclude final argument. In civil actions, it is reversible error to deny a defendant its right to open and conclude closing argument if he or she introduces no evidence in response to the plaintiff's case, unless the evidence demands a verdict. *Smith v. Smith*, 228 Ga. 820, 823 (188 SE2d 507) (1972);

---

[1] The jury found that there was no specific intent to harm.

*American Cas. Co. v. Seckinger*, 108 Ga. App. 262, 263 (132 SE2d 794) (1963). See also OCGA § 9-10-186. Here, the defendants rested after the plaintiffs' case without calling any witnesses; but the multiple defendants did question each of their own party witnesses, who had been called on cross-examination in the plaintiffs' case. The court allowed the plaintiffs to open and conclude closing argument.

(a) Jennings first contends that the defendants waived their right by failing to make a motion to open and close before the plaintiffs submitted any testimony. See *Intl. Indem. Co. v. Coachman*, 181 Ga. App. 82, 90 (6) (351 SE2d 224) (1986). But "[s]uch notice is required only where the party has the right to open and conclude closing arguments at the time that the other party testifies." (Footnote omitted.) *Hussey v. Hussey*, 273 Ga. 735, 737 (2) (545 SE2d 880) (2001); *Auto Mut. Indem. Co. v. Campbell*, 56 Ga. App. 400 (1) (192 SE 640) (1937).[2] In this case, at the time that the plaintiffs were putting on evidence the defendants had not admitted a prima facie case, and therefore the plaintiffs had the burden of proof and the corresponding right to open and conclude closing argument. Accordingly, TGM was not required to assert the right at that time. See *Hussey*, 273 Ga. at 737.

(b) We do, however, find that the defendants lost the right to open and close. The plaintiffs called several defendants to the stand during their case for the purposes of cross-examination. See OCGA § 24-9-81. During cross-examination of the first of the defendants, the lawyer who represented all four defendants indicated that he would like to question the witness, as follows:

> Your Honor, [plaintiffs' counsel] called Ms. Caruthers for the limited purpose of cross-examination. And I suspect that he's going to take [the] position that means I can't ask her any questions.
>
> Now, he has sued multiple defendants in this case. And he has spent a good portion of today establishing that she violated TGM policies. Okay. Theoretically, the jury could find in favor of TGM and against her.
>
> I say that to illustrate the fact that *there are separate and distinct interests between the defendants*. Now, even if there weren't, you could exercise discretion and allow me to question her today. But because there are separate and dis-

---

[2] For example, "where a defendant has the right to make opening and closing arguments by admitting the plaintiff's prima facie case, she must make a timely assertion of that right before putting the plaintiff to the trouble of establishing his case, or else the right is deemed waived. OCGA § 9-10-186. [Cits.]" *Hussey*, 273 Ga. at 737, n. 3.

tinct interests, counsel is entitled to question this witness. . . .

And I think that when [plaintiffs' counsel] is finished with her, I'm entitled to ask her some questions. . . . And, certainly, even if I wasn't, you could exercise discretion to allow that. *And I think that this case is going to go a lot quicker if we get to ask our questions now because if I call her back next Monday for ten minutes, then he's going to cross-examine her for half an hour, which won't happen if we do it today.*

(Emphasis supplied.)

The court agreed that the procedure would make presentation of the case more efficient and therefore ruled that defense counsel would be allowed to question the defendants during the plaintiffs' case.

In Georgia, after properly announced cross-examination of a defendant called during the plaintiff's case, it is within the discretion of the trial court to allow defense counsel to question the defendant. *Colwell v. Voyager Cas. Ins. Co.*, 251 Ga. 744, 747 (1) (309 SE2d 617) (1983). Under these circumstances, defense counsel may only question by direct examination. Id. Compare *Thomas v. Baxter*, 234 Ga. App. 663, 666-667 (1) (507 SE2d 766) (1998) (certain exceptions).

In this case, defense counsel caused his own problem. First, he gave the court directly inconsistent information about what type of questioning he intended to do. At one point he stated, "I'm interested in doing an examination, not a cross-examination." But, by indicating that the defendants had separate and distinct interests, defense counsel implied that he intended, at least in part, to cross-examine some of the defendants on the grounds that they were adverse. Because cross-examination is not allowed under the circumstances, see *Colwell*, 251 Ga. at 747 (1), the trial court could reasonably infer that defense counsel had no concern about the right to open and conclude closing argument. Second, the case law that defense counsel cited in support of his request to question the witnesses was not on point.[3] Third, he implied that he might call the defendants during *the defense's case* and that he sought to question the defendants during the plaintiffs' case only to make the trial more efficient; he did not

---

[3] Defense counsel submitted the case of *Crumbley v. Wyant*, 188 Ga. App. 227 (372 SE2d 497) (1988), as the only support for his position. The only relevant point found in that case is that co-defendants with adverse interests may cross-examine each other's expert witnesses. Oddly, this case illustrates that by stating that the defendants in this case had separate and distinct interests, defense counsel was indicating that he intended to cross-examine his own witnesses.

raise authority for the proposition that he was entitled to question his witnesses under the circumstances.

The court therefore agreed to allow the questioning under circumstances created by the defendants that would indicate that the defendants were not concerned about the right to open and conclude closing argument. One cannot complain of a ruling that his own trial procedure and conduct procured or aided in causing. *Peters v. Davis*, 214 Ga. App. 885, 887 (449 SE2d 624) (1994); *West v. Nodvin*, 196 Ga. App. 825, 829 (397 SE2d 567) (1990).[4]

6. TGM contends the trial court should have granted a new trial because the verdict was so excessive as to shock judicial conscience. The jury awarded $10,625,000 damages for wrongful death and $2,500,000 in pain and suffering.

"Absent a showing that the jury verdict was so flagrantly excessive as to shock the conscience, creating a clear implication of bias, prejudice, or gross mistake on the part of the jurors so as to warrant a new trial, the appellate court will not disturb a verdict approved by the trial court." (Citations omitted.) *Witty v. McNeal Agency*, 239 Ga. App. 554, 563 (6) (521 SE2d 619) (1999). "In particular, appellate courts should be hesitant to second-guess verdicts where the damage award is based in any significant part on pain and suffering." (Citation omitted.) *Alternative Health Care Systems v. McCown*, 237 Ga. App. 355, 362 (7) (514 SE2d 691) (1999). Moreover, because the trial court has approved the verdict by denying TGM's post-trial motion, a presumption of correctness arises that will not be disturbed absent compelling evidence. *E-Z Serve Convenience Stores v. Crowell*, 244 Ga. App. 43, 47 (2) (535 SE2d 16) (2000).

(a)

> In a wrongful death action damages may be awarded for the full value of the deceased's life. Generally, these damages may be categorized as: (1) those items having a proven monetary value, such as lost potential lifetime earnings, income, or services, reduced to present cash value or (2) lost intangible items whose value cannot be precisely quantified, such

---

[4] We also note that the case of *Sutherland v. Woodring*, 216 Ga. 621 (118 SE2d 482) (1961), cited by the dissent, could be read together with OCGA § 9-10-186 to create an anomaly in the law. They could be read to allow defendants in civil cases to retain the right to open and conclude closing argument under circumstances where there is no apparent underlying policy reason to do so. If the plaintiff calls the defense witnesses and other relevant witnesses during his or her case, *Sutherland* and OCGA § 9-10-186 could be cited in support of allowing defense counsel to put on his or her entire case during the plaintiff's case, yet not be considered to have introduced any evidence for the purpose of deciding which party is allowed to open and conclude closing argument.

as a parent's "society, advice, example and counsel . . ." as determined by the enlightened conscience of the jury.

(Citations omitted.) *Consolidated Freightways Corp. of Delaware v. Futrell*, 201 Ga. App. 233 (1) (410 SE2d 751) (1991). The jury heard evidence that the monetary value of Jennings' life was at least $1,800,000. Furthermore, evidence was presented to show that Jennings was a young mother, was engaged to be married, had other family, and was looking forward to a long life. Although the jury's verdict was large, we cannot say it shocks the conscience, nor is there any clear indication the jury was biased, prejudiced, or grossly mistaken.

(b) With regard to pain and suffering, the evidence shows that Jennings "was strangled by the [nylon] stocking having been pulled tightly around her neck from behind. Tied behind her neck in that same fashion, so tight that [you] couldn't slip a finger between the ligature and the skin on her neck." Her death was not immediate; she retained consciousness for upwards of forty seconds and did not die for three to five minutes. She had scrapes on her neck caused by her own nails when she attempted to get the ligature off. We find no compelling reason to overturn the award of pain and suffering. See, e.g., *Beam v. Kingsley*, 255 Ga. App. 715, 716 (1) (566 SE2d 437) (2002) (affirming $2,584,000 award for funeral expenses and pain and suffering).

7. The defendants' enumeration that they were entitled to summary judgment is made moot by our decision.

*Judgment affirmed. Smith, C. J., Johnson, P. J., Blackburn, P. J., Ruffin, P. J., Eldridge, Barnes, Miller, Ellington, Phipps and Mikell, JJ., concur. Andrews, P. J., dissents.*

ANDREWS, Presiding Judge, dissenting.

I respectfully dissent. Because the defendants rested without introducing any evidence, they were entitled to open and conclude the closing arguments. The defendants did not lose this right when the trial court exercised its discretion to allow defense counsel to directly examine defendants called by the plaintiffs for cross-examination during the plaintiffs' case. The trial court's refusal, over objection, to allow the defense to open and conclude argument was reversible error requiring a new trial.

The record shows that the plaintiffs rested their case after calling numerous witnesses, including four defendants or agents of defendants called for the purpose of cross-examination pursuant to OCGA § 24-9-81. The trial court exercised its discretion to allow defense counsel to conduct direct examination of the four defendants or agents during the plaintiffs' case immediately after plaintiffs'

counsel concluded cross-examination. After the plaintiffs rested their case, the defendants rested without calling any witnesses or introducing any evidence.

It has long been the rule in this State that, where a defendant in a civil case offers no evidence, he is entitled to the opening and concluding arguments. *Martin v. Martin*, 180 Ga. 782, 783, 785 (180 SE 851) (1935); *Peters v. Davis*, 214 Ga. App. 885, 886 (449 SE2d 624) (1994); OCGA § 9-10-186; Uniform Superior Court Rule 13.4 (applicable to state courts through the Uniform State Court Rules). It is also settled law that a defendant who introduces no evidence at trial does not lose the right to open and conclude argument merely because defense counsel is allowed to conduct direct examination of the defendant after the defendant is called in the plaintiff's case for purposes of cross-examination pursuant to OCGA § 24-9-81. *Martin*, 180 Ga. at 783. In *Sutherland v. Woodring*, 216 Ga. 621 (118 SE2d 482) (1961), the Supreme Court addressed the following certified question:

> Is the defendant in a civil case entitled to the opening and concluding arguments where the plaintiff's counsel calls him to the stand for the purpose of cross-examination, and where the defendant's counsel examines the defendant while on the stand in such circumstances on material issues in the case, after the completion of the cross-examination of the defendant by plaintiff's counsel, nothing further in the way of evidence of any other kind having been introduced by the defendant?

(Punctuation omitted.) Id. at 622. Citing *Martin*, 180 Ga. at 785, the court answered the question in the affirmative — that under the circumstances the defendant was entitled to open and conclude argument. Accordingly, "mere direct examination of defendant by his counsel when defendant has been called by plaintiff for cross-examination does not constitute the offering of evidence for this purpose. [Cit.]" *Peters*, 214 Ga. App. at 886; *Milligan v. Milligan*, 209 Ga. 14, 16 (70 SE2d 459) (1952); *Lissmore v. Kincade*, 188 Ga. App. 548, 550 (373 SE2d 819) (1988).

Moreover, where the evidence presented at trial does not demand the verdict rendered, to erroneously deny the defendant the right to open and conclude the closing argument is reversible error which requires the grant of new trial. *Milligan*, 209 Ga. at 15-16; *Thico Plan, Inc. v. Ashkouti*, 171 Ga. App. 536, 537 (320 SE2d 604) (1984); *Lissmore*, 188 Ga. App. at 549-550; *Canada Dry Bottling Co. v. Campbell*, 112 Ga. App. 56, 57-58 (143 SE2d 785) (1965); *Auto Mut.*

*Indem. Co. v. Campbell*, 56 Ga. App. 400 (192 SE 640) (1937); *Jones v. Chambers*, 94 Ga. App. 433 (95 SE2d 335) (1956).

> The right to open [the closing argument] is important. It enables the party to give direction to the case, very often to choose the ground on which the battle shall be fought. And the right to conclude is more important still. Even in fair and legitimate argument, the party concluding has the advantage of knowing precisely the line of his opponent, and therefore of directing his attention to it, and arraying everything in the case, that fairly illustrates and sustains his view of it.

*Buchanan v. McDonald*, 40 Ga. 287, 288 (1869). It is undisputed that neither the verdict establishing liability nor the amount of damages awarded in the present case was demanded by the evidence, so the trial court's erroneous denial of this important right to the defendants demands reversal and a new trial.

There is no basis for the majority's contrary conclusion that the defendants lost the right to open and conclude the closing arguments. The record shows that the plaintiffs exercised their rights under OCGA § 24-9-81 to call the two individual defendants and two agents of a corporate defendant for purposes of cross-examination. See *Colwell v. Voyager Cas. Ins. Co.*, 251 Ga. 744, 746 (309 SE2d 617) (1983). This prompted defense counsel to ask the trial court for permission to conduct direct examination of the defendants and agents after plaintiffs' counsel finished each cross-examination. As the Supreme Court held in *Colwell*,

> If the adverse party or agent as specified in OCGA § 24-9-81 . . . is called, and a timely announcement is made by the calling party that the witness is being called for cross-examination, the calling party may cross-examine the witness and the adverse party may question him only by direct examination.[5] . . . [T]he trial court has discretion to allow the noncalling party to question the witness at the conclusion of the cross-examination, or to require the noncalling party to recall the witness during the noncalling party's portion of the case. [Cit.]

Id. at 747, n. 5; *Jones*, 94 Ga. App. at 433.

---

[5] Cf. *Thomas v. Baxter*, 234 Ga. App. 663, 665-666 (507 SE2d 766) (1998) (within trial court's discretion to allow leading questions or questions exceeding the scope of the plaintiff's examination of the witness under OCGA § 24-9-81).

Defense counsel argued that he should be entitled to conduct direct examination after the cross-examination because there were separate and distinct interests between the defendants, because the trial court had discretion to allow him to conduct the examination, and because, if the court exercised that discretion, the trial would be more efficient. Plaintiffs' counsel responded by directing the trial court to the holding of *Barton v. Strickland*, 208 Ga. 163 (65 SE2d 602) (1951), where the court concluded that, after plaintiff's counsel cross-examines under OCGA § 24-9-81, defense counsel has no absolute right to examine the defendant. The trial court responded that:

> You may have a case that they don't have an absolute right, but do you have anything that says I don't have the discretion to allow them? . . . I think it's a lot easier for the jury to hear from one witness all at once than to piecemeal it. It's more efficient. It makes more sense. You don't have to recover ground to bring the examination to context. I'm going to allow it.

But plaintiffs' counsel continued to object:

> Judge, we believe that he's going to seek to do this with every witness. It interferes with the presentation of our case, and we would take exception to it. We understand the Court's ruling. This is not the only witness he's going to seek to do it with. Every time we put a witness up [under OCGA § 24-9-81] trying to move our case along, he's going to seek to do that.

The trial court replied:

> That's maybe why he said he could do his case in one day. He's going to use all your time. But I think that in the long run it will aid the jury in understanding the issues because they're going to hear everything from a witness together rather than having it broken up.

Plaintiffs' counsel continued:

> One other point, Your Honor. . . . If [defense counsel] is allowed to direct examine this witness, we regard that as opening his case to the extent that he is doing direct. Because if not, then he could not put up any evidence and [be] allowed to do closing and close. We believe that would be incredibly unfair because he is in essence opening up his case by performing direct. . . . The only thing we would

want to point out is if he should do direct in our case, he should be deemed to have put up evidence so that he doesn't try to sandbag us.

The trial court replied: "We'll deal with that when we get to it. It's not an issue yet." Finally, after a recess at which the trial court examined the case law, the court reiterated its ruling:

*[A]t this point I'm going to exercise my discretion to allow the examination of witnesses by the defendant even though they've been called for purposes of cross. And if the defendant puts up no other evidence after the plaintiff rests, we'll then address the question about whether they've waived the right to both opening and close.* But I anticipate that won't come up.

Thereafter, the plaintiffs crossed-examined the two individual defendants and two agents for a corporate defendant pursuant to OCGA § 24-9-81, and in each case the trial court allowed defense counsel to conduct a direct examination of the witness after the cross-examination. During defense counsel's direct examination of the witnesses, plaintiffs' counsel interposed several hearsay objections, one objection that the witness was giving conflicting testimony, one objection that a question mischaracterized testimony, and one objection to the form of a question. There were no other objections, and other than the rulings on the objections, the trial court made no rulings respecting defense counsel's direct examinations of the defendants during the plaintiffs' case. As to all four defendants called for cross-examination, the trial court allowed plaintiffs' counsel to recross-examine the witness after defense counsel finished direct examination.

At the conclusion of the plaintiffs' case, plaintiffs' counsel moved the trial court for the right to open and conclude the closing argument. Defense counsel, who thereafter rested without calling any witnesses or introducing any evidence, objected and argued that, because the defendants presented no evidence, the defense was entitled to open and conclude the closing arguments.[6] The trial court

---

[6] Contrary to plaintiffs' claims, the defendants were not required to assert the right to open and close before the plaintiffs submitted testimony. Such prior notice is required "only where the party has the right to open and conclude closing arguments at the time that the other party testifies." *Hussey v. Hussey*, 273 Ga. 735, 737 (545 SE2d 880) (2001). Since the plaintiffs had the burden of proof on their claims, the right to open and conclude argument rested with the plaintiffs while they presented their case. Id. at 736-737, n. 2; OCGA § 9-10-186. The defendants did not admit a prima facie case, so they did not acquire the right to make opening and closing arguments. OCGA § 9-10-186. It follows that the defendants were not required to announce in advance that they did not intend to introduce evidence, or to

ruled that the plaintiffs were entitled to open and conclude argument because the defendants had introduced evidence when defense counsel was allowed to directly examine the defendants after they were called by the plaintiffs under OCGA § 24-9-81. According to the trial court, when the court exercised its discretion to allow defense counsel to examine the defendants after they were called by the plaintiffs for cross-examination,

> I allowed that more for the convenience of the jury and hearing from one witness all at once, rather than having that witness's testimony broken up. But I do believe that my recollection is that those witnesses' testimony was that the defendants went beyond clearing up issues raised by the plaintiff in direct examination and affirmatively introduced some evidence themselves through those questions. So given that, I think the defendant has presented evidence, although for the purposes of streamlining the trial, it was done out of order. So I'm going to give the plaintiff [the] right to open and conclude and make the first and last closing arguments.

There is no support in the record or the law for the trial court's ruling. The record is clear that the trial court exercised its discretion to allow defense counsel to conduct direct examination of the defendants during the plaintiffs' case after plaintiffs' counsel conducted cross-examination under OCGA § 24-9-81. In exercising this discretion, the trial court decided to allow defense counsel to conduct the examinations during the plaintiffs' case rather than requiring the defense to recall the witnesses during the defense's portion of the case. *Colwell*, 251 Ga. at 747, n. 5. When a trial court exercises this discretion, a direct examination by defense counsel on material issues in the case — conducted during the plaintiffs' portion of the case — does not constitute the introduction of evidence by the defense for purposes of determining whether the defense has the right to open and conclude closing argument. *Sutherland*, 216 Ga. at 622; *Martin*, 180 Ga. at 783; *Peters*, 214 Ga. App. at 886. Defense counsel did nothing more than conduct the direct examination which the trial court exercised its discretion to allow. The fact that the trial court may have exercised this discretion because it would help streamline the case changes nothing. Moreover, there is nothing in the record which could remotely be construed as a ruling by the trial

---

assert in advance the right to open and conclude arguments, before putting the plaintiffs to the trouble of establishing their case. OCGA § 9-10-186; *Hussey,* 273 Ga. at 737, n. 3; *Campbell*, 56 Ga. App. 400.

court that, every time a defendant was called by the plaintiffs and cross-examined under OCGA § 24-9-81, the defense was allowed to interrupt the plaintiffs' case, open its own portion of the case to call the defendant out of order for direct examination, then allow the plaintiffs' case to recommence for the next defendant to be called and cross-examined.

To sustain the trial court's ruling, the majority employs a similarly twisted logic. The majority finds that defense counsel, by various implications, convinced the trial court to allow him to periodically call the defendants during the plaintiffs' case for efficiency, while at the same time indicating the defendants were not concerned about the right to open and conclude closing argument.

To the contrary, this is not a complicated issue, and both the law and the record are clear. The trial court exercised its discretion to allow defense counsel to conduct direct examinations of the defendants and agents after the plaintiffs called them for cross-examination. The ensuing direct examination of the defendants during the plaintiffs' case cannot be construed to work a forfeiture of the defendants' right to open and conclude closing argument.

DECIDED DECEMBER 1, 2003 — 

*Weinberg, Wheeler, Hudgins, Gunn & Dial, Earl W. Gunn, John C. Bonnie, Nancy G. Cook,* for appellants.

*Matthews & Steel, John D. Steel, Charles A. Mathis, Jr., Douglas P. McManamy,* for appellees.