A04A0956. GOVEA et al. v. CITY OF NORCROSS et al.
A04A0957. CITY OF CHAMBLEE v. GOVEA et al.
(608 SE2d 677)

PHIPPS, Judge.

On August 11, 2001, 13-year-old Jairo Govea Gomez fatally shot himself with a police service weapon that had been handed to him by Timothy Heiberger, a police officer with the police department of the City of Chamblee ("Chamblee") and a former police officer with the police department of the City of Norcross ("Norcross"). Jairo's parents, David Govea and Teresa Gomez, filed a wrongful death action against Chamblee and Norcross.[1] They alleged that, through negligent acts and omissions attributable to both municipalities, Heiberger procured a police officer position with Chamblee; that through such employment, Heiberger established a relationship with Jairo; and that this relationship brought about the circumstances that ended Jairo's life.

On cross-motions for summary judgment, the trial court granted Norcross's motion and denied the other parties' motions. In Case No. A04A0956, Govea and Gomez appeal the grant of summary judgment to Norcross and the denial of their motion for partial summary judgment against Norcross. In Case No. A04A0957, Chamblee appeals the denial of its motion. Because no party has shown that it was entitled to summary judgment, we affirm the denial of Govea and Gomez's motion, reverse the grant of Norcross's motion, and affirm the denial of Chamblee's motion.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[2] We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant.[3]

---

[1] Heiberger is not a party to this lawsuit.

[2] OCGA § 9-11-56 (c).

[3] *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

Construed in this light, the record shows that Heiberger worked as a police officer for Norcross from April 1988 through March 1999. During his tenure, he received special training in working with youth and established relationships with adolescent boys in the community, using those relationships to gather information which he used in criminal investigations. Also while working for Norcross, Heiberger was reprimanded by his superior officers for numerous infractions. Govea and Gomez cite the following. In 1991, Heiberger left his loaded service weapon in the front seat of an unattended vehicle. In 1993, Heiberger damaged a police radio by spilling a soft drink on it. Also that year, he damaged a police vehicle by backing it into a tree, and afterward, he failed to properly report the accident. In 1994, he damaged a portable police radio by placing it on the roof of his vehicle and then driving off. In 1996 and in 1998, Heiberger mishandled evidence and failed to submit investigative reports of assigned cases. And in 1997, Heiberger left his assigned police vehicle unclean, inadequately fueled, and with two .45 caliber rounds of ammunition on the front seat. Written citations and reprimands pertaining to these infractions were added to Heiberger's personnel file maintained by Norcross. That file also contained Heiberger's performance appraisals. The 1997 appraisal stated that Heiberger "fails to display knowledge of department policies, regulations, and procedures and violates same" and that he "fails to follow accepted safety procedures," with remarks that he "has been issued various equipment in order to perform the duties assigned, but on several occasions has failed to carry the equipment (handcuffs, pepper spray). These items, although not . . . needed daily should be carried and maintained." Similarly, the 1998 appraisal stated that Heiberger "fails to follow accepted safety procedures," with remarks that he "would often place himself in a poor tactical position when dealing with suspects (i.e., turn his back toward suspect and/or would carry his weapon in the waist of his pants). Officer Heiberger was counseled for not carrying assigned equipment or carrying equipment (weapon) in a condition that was a safety factor."

By October 1998, having reviewed Heiberger's personnel file and observed his "lack of willingness to address any problem," Heiberger's immediate supervisor was concerned about "negligent retention" issues. He and the assistant chief of police agreed that Heiberger's employment should be terminated. By memorandum dated February 25, 1999, the Norcross police chief informed Heiberger that he intended to terminate his employment effective March 10, 1999, based on Heiberger's 1998 and 1999 infractions of failure to attend assigned training, failure to make a court appearance, failure to complete accident reports, tardiness, failure to complete time sheets,

and misuse of sick leave. The memorandum advised Heiberger of his right to appeal the decision.

According to Heiberger, on March 2 he met with the police chief, who implied that if he resigned without appeal, then the chief would report to the Georgia Peace Officer Standards and Training (POST) Council that he had "voluntarily resigned" rather than "resigned in lieu of dismissal." Heiberger testified that he and the police chief agreed that the documents relating to his proposed discharge would not be disclosed or revealed to prospective employers. On March 5, Heiberger resigned, and the police chief submitted written notice to the POST Council that Heiberger had voluntarily resigned.

In March 1999, Heiberger applied for employment as a police officer with the police department of the City of Lilburn ("Lilburn"), stating that he had voluntarily resigned from Norcross. Lilburn's review of Heiberger's personnel file revealed what it considered unacceptable conduct by Heiberger, such as failing to report for duty, missing court dates, and mishandling evidence. Determining that such conduct demonstrated carelessness, lack of attention to detail, and lack of focus on the job, Lilburn decided not to hire Heiberger.

In May 1999, Heiberger applied for employment as a police officer with Chamblee, reporting that he had voluntarily resigned from Norcross. After contacting the POST Council concerning Heiberger and reviewing Heiberger's personnel file at Norcross, Chamblee hired him in July 1999. During his field training, Heiberger was cited for not searching the back seat of his patrol car after transporting prisoners and thus failing to discover a knife left there; failing to yield at an intersection until the instructor yelled and driving through a red light at another intersection (both incidents were due to his inattentiveness while driving); and improperly applying high-risk handcuffing procedures, although the correct procedure had previously been demonstrated to him. After his training period, Heiberger was reprimanded for leaving his police identification card at an auto parts store as collateral on a debt. In April 2000, Heiberger resigned to work for a private employer. About two months later, he resigned from there and asked to be rehired at Chamblee. After Chamblee confirmed that Heiberger had left the private employer in good standing, it rehired him in June 2000. Heiberger was not required to undergo any additional training or background investigation.

While at Chamblee, Heiberger continued his work with youth, coaching a soccer team of adolescent boys in the community. He considered his involvement with the team part of "community-oriented policing," entailing police interaction with the public to gain intelligence to solve cases. Heiberger testified that he gained intelligence from the team players "almost on a . . . daily basis" and that Chamblee's police chief encouraged his efforts.

While on routine foot patrol about a week and a half before the tragic incident, Heiberger met Jairo and his family in the family's store, which was on his beat. Heiberger told them that he was a police officer working with youth and that he coached a soccer team that Jairo could join. Jairo excitedly joined the team.

On the day of the shooting, Heiberger encountered Jairo near the family store. With Heiberger was a 12-year-old member of the soccer team. Heiberger, who was wearing his police uniform, and the team member took Jairo home, where Jairo asked to examine Heiberger's service weapon. Heiberger took the clip out of his weapon, set the clip on a piece of furniture, disassembled the gun, showed him how to reassemble it, handed it to the child, and then became distracted in a conversation with Jairo's team member. Meanwhile, Jairo loaded the gun, and then called out to Heiberger. As Jairo was holding the gun, it discharged, sending a bullet through the child's chest.

Govea and Gomez sought damages for the wrongful death of their son.[4] With regard to Norcross, they alleged that it had misrepresented Heiberger's employment record to the POST Council by stating that Heiberger had "voluntarily resigned," rather than "resigned in lieu of termination," and that it had "sanitized" Heiberger's personnel file before allowing Chamblee to review it. Charging negligence per se and relying on theories under the Restatement of Torts, the parents claimed that those acts and omissions violated POST statutes and regulations mandating a law enforcement unit to disclose accurately and fully the circumstances surrounding a peace officer's termination. With regard to Chamblee, Govea and Gomez alleged that the municipality had negligently hired and retained Heiberger.

Govea and Gomez moved for partial summary judgment against Norcross regarding liability, based on the theory of negligence per se. Norcross moved for summary judgment, arguing that it had not misrepresented Heiberger's employment history, that it had no duty to Govea and Gomez, that the public duty doctrine barred Govea and Gomez's claims, and that none of its acts or omissions could have proximately caused Jairo's death. The trial court ruled that the reporting requirements mandated by the POST statutes and regulations provided no private cause of action. It further determined that any malfeasance by Norcross in providing incomplete or inaccurate reports either to the POST Council or to Chamblee was not the

---

[4] The parents alleged that the municipalities were liable for Jairo's death to the extent that they had waived immunity through the purchase of insurance that covered the claims.

proximate cause of Jairo's death. The court reasoned that even if Norcross had breached the standard of care regarding Heiberger's employment records,

> [Norcross's] responsibility for any potential injury resulting from that employment ended with Heiberger's resignation from the Chamblee Police Department in April, 2000. Norcross had no way to predict that Chamblee, after observing the quality of Heiberger's work for nine months, would rehire Heiberger in June, 2000. The Chamblee Police Department was independently aware of the unsatisfactory elements of Heiberger's performance from the work he performed with Chamblee. Thus, if indeed any liability attaches from Heiberger's employment with the Chamblee Police Department, any possible malfeasance on the part of Norcross is too attenuated to be actionable.

Chamblee also moved for summary judgment. The court denied its motion, finding jury questions on the claims of negligent hiring and retention.

### Case No. A04A0956

1. Govea and Gomez contend that the trial court erred in denying their motion for partial summary judgment on the ground that the POST statutes and regulations create no private cause of action.

The Georgia General Assembly established the Peace Officer Standards and Training (POST) Act[5] to regulate various aspects of law enforcement.[6] Regarding record keeping and reporting, the POST Act requires each law enforcement unit to prepare duplicate records on any peace officer it employs.[7] One copy shall be kept at the law enforcement unit's headquarters and the second copy shall be forwarded to and maintained by the POST Council.[8] The contents of these records shall be released to any law enforcement unit considering the candidate or peace officer for employment.[9]

The POST Act prohibits knowingly making "misleading, deceptive, untrue, or fraudulent representations in the practice of being a peace officer or in any document connected therewith."[10] Further, the

---

[5] OCGA § 35-8-1 et seq.

[6] See OCGA § 35-8-7.

[7] OCGA § 35-8-15 (a).

[8] Id.

[9] OCGA § 35-8-15 (b).

[10] OCGA § 35-8-7.1 (a) (2).

POST Council, vested with the power to establish regulations,[11] has set forth in Ga. Comp. R. & Regs. r. 464-3-.06 that,

> [e]mploying agencies . . . discharging . . . certified officers for disciplinary reasons or accepting resignations in lieu of termination shall inform the Council in writing within ten (10) days of such action and records concerning the disciplinary action shall be made available to an investigator with POST Council.

The POST Council is also vested with authority to discipline a certified peace officer for numerous reasons, including its determination that the officer has "[b]een suspended or discharged by the peace officer's employing law enforcement unit for disciplinary reasons"[12] or that the officer has engaged in "any unprofessional . . . or deleterious conduct or practice harmful to the public, which conduct or practice need not have resulted in actual injury to any person."[13] When the POST Council finds that a person should be disciplined, it may, among other options, suspend any certificate for a definite period, limit or restrict any certificate, or revoke any certificate.[14]

Unquestionably, the POST statutes and regulations impose recording and reporting duties upon a law enforcement unit. However, it is well settled that violating statutes and regulations does not automatically give rise to a civil cause of action by an individual claiming to have been injured from a violation thereof.[15] Notably, the POST Act does not expressly provide a cause of action for damages for violations of the reporting requirements. That omission is significant because the General Assembly was not silent on the means of enforcing POST statutes. The POST Act expressly authorizes civil actions, but only by the POST Council, only for injunctive relief, and only under certain circumstances not alleged here.[16] The General Assembly could have created a cause of action in favor of private individuals injured for a unit's noncompliance with the POST Act reporting requirements. But it did not. Govea and Gomez have pointed to nothing in the POST statutory scheme that shows any legislative intent for such noncompliance to create a civil cause of

---

[11] OCGA § 35-8-7 (23).

[12] OCGA § 35-8-7.1 (a) (11).

[13] OCGA § 35-8-7.1 (a) (6).

[14] OCGA § 35-8-7.1 (b) (1).

[15] See generally *Mattox v. Yellow Freight Systems*, 243 Ga. App. 894, 895-896 (534 SE2d 561) (2000); *Troncalli v. Jones*, 237 Ga. App. 10, 12 (1) (514 SE2d 478) (1999); *Rolleston v. Huie*, 198 Ga. App. 49, 50 (2) (400 SE2d 349) (1990).

[16] OCGA § 35-8-17 (b), (c).

action for damages by an alleged victim of the violation.[17] Consequently, even assuming, without deciding, that Norcross failed to meet its reporting duties pursuant to POST statutes and regulations,[18] Govea and Gomez cannot recover damages based on their asserted theory of negligence per se. Accordingly, the denial of their motion for partial summary judgment against Norcross regarding liability based on that theory was proper.

2. Contesting the grant of summary judgment to Norcross, Govea and Gomez cite alternative theories of liability, contending,

> Norcross'[s] duty to accurately report Heiberger's termination and provide a complete copy of his personnel records arose out of common law principles embodied in Sections 311, 324A, and 522 of the Restatement of Torts 2d.

Govea and Gomez claim that, under these theories, they rely on the POST statutes and regulations only to establish the standard of care governing Norcross's duty not to give misinformation concerning Heiberger's employment history.

Section 324A of the Restatement (Second) of Torts, entitled "Liability to Third Person for Negligent Performance of Undertaking," pertinently provides,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Section 522 deals with "Strict Liability." However, the record reveals that Govea and Gomez's counsel argued at the hearing on the

---

[17] See generally *Reilly v. Alcan Aluminum Corp.*, 272 Ga. 279 (528 SE2d 238) (2000); *Troncalli*, supra; *Cechman v. Travis*, 202 Ga. App. 255, 256 (1) (414 SE2d 282) (1991).

[18] See *Maner v. Chatham County*, 246 Ga. App. 265, 267 (540 SE2d 248) (2000) (removing disciplinary materials from a police officer's employment file to preserve the officer's POST certification violated POST statutes and regulations).

cross-motions for summary judgment that Section 552 of the Restatement (Second) of Torts applied. That section, entitled "Information Negligently Supplied for the Guidance of Others," pertinently provides,

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

And Section 311, entitled "Negligent Misrepresentation Involving Risk of Physical Harm," pertinently provides,

> One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results (a) to the other, or (b) to such third persons as the actor should expect to be put in peril by the action taken.

The record shows that counsel for Govea and Gomez cited these sections on cross-motions for summary judgment. However, the trial court did not consider these theories, apparently having ruled that the record was devoid of any evidence that Norcross proximately caused Jairo's death, a ruling we reverse in Division 3.[19] And as the parties' appellate briefs do not specifically and properly argue the applicability of these sections to this case, this issue remains to be decided by the trial court upon remand.[20]

3. Assuming, without deciding, that Govea and Gomez have a viable claim based upon one or more of the cited sections of the Restatement of Torts, we address their remaining challenge to the grant of summary judgment to Norcross. They argue that the trial court erred in determining that Norcross's misrepresentations, if any, did not proximately cause Jairo's death.

---

[19] Infra.

[20] *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002) (where trial court's legal analysis on a ruling for summary judgment is flawed, whether to consider under "right for any reason" rule the grounds for summary judgment not addressed by the trial court is left to appellate court's discretion).

To recover damages based upon a defendant's negligence, a plaintiff must show that the defendant's acts or omissions proximately caused the injury.[21]

> [I]t is well established that a wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. The natural and probable consequences are those which human foresight can foresee, because they happen so frequently that they may be expected to happen again. The possible consequences are those which happen so infrequently that they are not expected to happen again. Thus, negligence is predicated on what should have been anticipated rather than on what happened.[22]

What amounts to proximate cause is usually a jury question, except in plain, palpable and undisputable cases.[23]

Norcross counters that it could not have anticipated that Heiberger would become employed again as a police officer. But the record contains evidence that Heiberger had served over a decade as a police officer; that, when the Norcross police chief notified Heiberger that he intended to terminate his employment, the chief recognized that Heiberger was concerned about his peace officer certification; and that Norcross subsequently misrepresented Heiberger's employment history to portray it more favorably. Construed against Norcross as movant, the evidence could authorize a jury to find that it could have foreseen that Heiberger would obtain future employment as a police officer.

Norcross next counters that the trial court correctly found that it could not have anticipated that a subsequent employer would retain Heiberger even after it had observed unsatisfactory elements of Heiberger's performance. Thus, Norcross claims, Chamblee's negligent retention of Heiberger constituted an unforeseeable intervening act that became the sole proximate cause of Jairo's death.[24]

> [T]he general rule is that if, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient

---

[21] *Atlanta Obstetrics & Gynecology Group v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990).

[22] (Punctuation and footnotes omitted.) *Thomas v. Food Lion*, 256 Ga. App. 880, 882 (1) (570 SE2d 18) (2002).

[23] *Atlanta Obstetrics & Gynecology Group*, supra at 570.

[24] See generally *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686-687 (2) (572 SE2d 533) (2002).

to stand as the cause of the misfortune, the former must be considered as too remote, still if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.[25]

Except in "plain and indisputable cases," whether an intervening act was reasonably foreseeable is a jury question.[26]

The evidence concerning whether Chamblee negligently retained Heiberger is not plain and indisputable.[27] And even assuming that Chamblee negligently retained Heiberger, the record does not mandate a finding that Norcross could not have anticipated that a subsequent employer would have retained him even after having observed dissatisfactory performance. Norcross documented years of instances of misconduct by Heiberger. But before resorting to proposing termination, it exhausted other alternatives, including suspensions, reprimands, counseling, and a psychological evaluation. During that time, Norcross permitted Heiberger to continue working as a uniformed police officer. Thus, whether Chamblee committed negligent retention and whether Norcross might have foreseen that Heiberger's subsequent employer would do so are questions for the jury. The trial court erred in granting summary judgment to Norcross on this basis.[28]

Finally, Norcross counters that it could not have foreseen that Heiberger would "let [Jairo] play with a gun and ammunition." The relevant question here is whether the particular incompetence, if any, that Heiberger demonstrated while working as a police officer at Norcross made it reasonably foreseeable by Norcross that Heiberger would cause personal harm to another through the negligent performance of his duties in future employment as a police officer.[29] We hold that the record contains sufficient evidence to authorize a jury to answer this question affirmatively.

Norcross points out that no misconduct of Heiberger had resulted in bodily injury to another. The infractions cited by Govea and Gomez

---

[25] (Citation and punctuation omitted.) Id.

[26] *North Ga. Elec. Membership Corp. v. Webb*, 246 Ga. App. 316, 318 (540 SE2d 271) (2000).

[27] See Division 6, infra.

[28] See *Ontario*, supra.

[29] See generally *Munroe v. Universal Health Svcs.*, 277 Ga. 861, 862-863 (1) (596 SE2d 604) (2004).

clearly demonstrate Heiberger's inattentiveness, carelessness, and even disregard for police requirements and mandatory procedures. Although some of the instances arguably may have only indirectly compromised the public's safety — such as evidence mishandling, unexplained court absences, tardiness, failure to complete reports timely, and improper use of sick leave, other of Heiberger's breaches more directly endangered the public. Heiberger left his loaded service weapon in the front seat of an unattended vehicle. While that incident occurred in 1991, it was not Heiberger's final failure to adhere to safe and proper protocol regarding weaponry that posed a threat to public safety. In 1997, Heiberger left ammunition unattended on the front seat of his police vehicle. That same year, he disregarded "accepted safety procedures" by failing to carry handcuffs and pepper spray and by carrying his service weapon in the waist of his pants.

Jairo gained access to the gun and ammunition because Heiberger failed to adhere to safety mandates. Given Heiberger's pattern of disregarding safety requirements and mandated procedures, along with his history of an inability or unwillingness to conform his conduct to police rules and regulations, despite repeated suspensions, reprimands, and counseling, a jury might determine that it was foreseeable by Norcross that Heiberger would cause personal injury to another through negligent performance of his duties in future employment as a police officer.[30]

4. Seeking affirmance of summary judgment in its favor under the "right for any reason" rule,[31] Norcross maintains that it made no misrepresentations either to the POST Council or in Heiberger's personnel file. It claims that, because Heiberger resigned without exhausting his right to appeal, there had been no final decision that he would be fired. Norcross asserts that it substantially complied with all requirements. But, as the trial court recognized, evidence on this point was conflicting. Thus, summary judgment on that basis was inappropriate.

5. Finally, Norcross maintains that Govea and Gomez's claims against it are barred by the public duty doctrine. That doctrine holds that a municipality may not be held liable for its failure to provide

---

[30] See generally *Harper v. City of East Point*, 237 Ga. App. 375, 376-378 (2) (515 SE2d 623) (1999) (employing municipality knew or should have known of its police officer's tendency to sexually assault another person, where the officer had been involved with three sexually inappropriate encounters with female citizens; also, because police officers wield enormous power and encounter vulnerable citizens, an employing municipality owes a higher duty than a private employer to protect citizens from abuses by officers), overruled in part, *Munroe*, supra at 863-864 (disapproving the "restrictive and inflexible" foreseeability standard, which required that a plaintiff show that the defendant employer could have anticipated the precise tortious or criminal act that caused the plaintiff's injury).

[31] *City of Gainesville*, supra at 835.

police protection based on a general duty to protect the public; it may be held liable for its failure to provide police protection only where the plaintiff can show the existence of a "special relationship."[32] The Supreme Court of Georgia has limited application of the public duty doctrine to "the provision of police services."[33] It has held that the doctrine "does not apply outside the police protection context."[34]

The duty allegedly breached by Norcross was to report fully and accurately the employment history of a peace officer to the POST Council and within the personnel file it maintained. That reporting requirement does not fall within the ambit of police protection as contemplated by the public duty doctrine. It is therefore inapplicable in the case against Norcross and thus unavailable to it as a defense.

### Case No. A04A0957

6. Chamblee contends that the trial court erred in denying it summary judgment on the claims of negligent hiring and retention.

> [A] defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's tendencies or propensities that the employee could cause the type of harm sustained by the plaintiff.[35]

(a) Chamblee argues that it did not and could not have foreseen from any of Heiberger's tendencies or propensities that the officer would cause Jairo's fatal injury. It points to undisputed evidence that Heiberger reported to Chamblee only that he had voluntarily re-signed from Norcross and that Chamblee's check with the POST Council revealed no disciplinary action for Heiberger. In addition, Chamblee points to its police chief's testimony that, had he known that Heiberger had been proposed for termination, Heiberger would not have been hired as a police officer by Chamblee.

Even if Chamblee could not have ascertained that Heiberger's resignation from Norcross was in lieu of termination, rather than voluntary, Chamblee had access to Norcross's personnel file for Heiberger. What that file contained when Chamblee reviewed it is controverted. Norcross's assistant police chief testified that he gave Chamblee's investigator the entire personnel file (with the exception of the confidential medical section, not relevant here). Chamblee's

---

[32] *Hamilton v. Cannon*, 267 Ga. 655, 656 (1) (482 SE2d 370) (1997).

[33] *Dept. of Transp. v. Brown*, 267 Ga. 6, 8-9 (471 SE2d 849) (1996).

[34] *Hamilton*, supra.

[35] (Punctuation omitted.) *Munroe*, supra at 863 (1).

investigator deposed, however, that certain documents were not in the file, including Norcross's police chief's February 25, 1999 memorandum to Heiberger and Heiberger's 1997 and 1998 appraisals.

But even if the file provided to Chamblee did not contain those conclusory documents, it did contain documents that formed the basis of Norcross's decision to propose termination and its basis for evaluating Heiberger as it did. Furthermore, construing the conflicting evidence against Chamblee as movant for summary judgment, the documents were not missing. Notably, Lilburn's investigator could not recall whether he saw any appraisals or any documents indicating that Norcross had contemplated firing Heiberger; yet, based on documents in Heiberger's personnel file, he concluded that Heiberger was not suited for a position as a police officer. Thus, with regard to negligent hiring, we find that a jury might conclude that Chamblee might have been alerted from Heiberger's personnel file that his tendencies or propensities would cause personal injury to another.

Regarding the claim of negligent retention, the evidence shows that, in addition to examining the personnel file before hiring Heiberger, Chamblee observed Heiberger in the performance of his duties. While working at Chamblee, Heiberger continued a pattern of inattentiveness, carelessness, and disregard of safety procedures designed to protect property and person. For example, he failed to yield while driving, ignored a red light while speeding through it, failed to detect a weapon in his vehicle, and failed to properly employ police maneuvers while apprehending a suspect. Chamblee concedes that, in handing the gun to Jairo, Heiberger ignored Chamblee's firearms policy that prohibited the removal of a firearm from an officer's holster except for a legitimate police purpose. Thus, the evidence sufficiently authorizes a jury to decide whether Chamblee could have foreseen from any of Heiberger's tendencies or propensities that, if retained, Heiberger would cause personal injury to another.

(b) Chamblee argues that nothing in Heiberger's history specifically showed that he would hand a 13-year-old his service weapon. But for an employer to be held liable,

> it is not necessary that [it] should have contemplated or even be able to anticipate the particular consequence which ensued, or the precise injuries sustained by the plaintiff. It is sufficient if, by exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.[36]

---

[36] (Citation and punctuation omitted.) Id. at 863.

Chamblee knew that its police officers interacted with the general public and were entrusted with dangerous instrumentalities, including guns. The evidence would authorize a jury to conclude that Chamblee might have foreseen that personal injury would result from hiring and retaining an officer with a history of inattentiveness and disregard for safety rules.[37]

(c) Chamblee argues that, at the time of the tragic incident, Heiberger was off-duty. Further, it claims that the officer's coaching activities were "wholly unrelated to his employment."

Generally, the theories of negligent hiring and retention require a showing that the employee committed the tortious act "during the tortfeasor's working hours or [when] the employee was acting under color of employment."[38] And employer "liability does not attach if the employee committed the tort in a setting or under circumstances wholly unrelated to his employment."[39]

The evidence showed that Heiberger used his status as a police officer to recruit members for the soccer team, who called him "Officer Tim." Heiberger used the team members to gain intelligence concerning criminal cases, and he was encouraged to do so by Chamblee's police chief. In broaching the subject of recruiting Jairo for the soccer team, Heiberger introduced himself to Jairo's parents as a police officer, and he was dressed in police uniform. In fact, Heiberger was in uniform at the time of Jairo's death. Thus, the trial court did not err in concluding that there was sufficient evidence to permit a jury to determine that Heiberger was acting under color of employment at the time of the shooting.

The trial court did not err in denying Chamblee's motion for summary judgment.

*Judgment affirmed in part and reversed in part in Case No. A04A0956. Judgment affirmed in Case No. A04A0957. Smith, C. J., and Johnson, P. J., concur.*

---

[37] See generally *Harper*, supra, overruled in part, *Munroe*, supra at 863-864 (disapproving the "restrictive and inflexible" foreseeability standard, which required a plaintiff show that the defendant employer could have anticipated the precise tortious or criminal act that caused the plaintiff's injury).

[38] (Citation and punctuation omitted.) *Harvey Freeman & Sons, Inc. v. Stanley*, 259 Ga. 233-234 (1) (378 SE2d 857) (1989). As an exception, negligent hiring and retention may be found when the employee has committed a tort "outside scope of employment," where there is a special relationship, such as landlord-tenant, between the employer and the victim and the tortious conduct arose out of that relationship. *Harvey Freeman & Sons, Inc. v. Stanley*, 189 Ga. App. 256, 257 (1) (375 SE2d 261) (1988), aff'd in part and rev'd in part on other grounds, 259 Ga. at 233-234 (1); see also *TGM Ashley Lakes v. Jennings*, 264 Ga. App. 456, 462 (1) (b) (590 SE2d 807) (2003); *New Madison South Ltd. Partnership v. Gardner*, 231 Ga. App. 730, 734 (2) (499 SE2d 133) (1998). However, Govea and Gomez do not argue that any special relationship existed between Jairo and Chamblee.

[39] (Citations omitted.) *TGM Ashley Lakes*, supra at 459 (1) (a).

50

Decided November 23, 2004 —
Reconsideration denied December 15, 2004 — 

*Eidson & Brennan, James A. Eidson, Timothy R. Brennan*, for Govea et al.

*Mullins, Whalen & Westbury, James R. Westbury, Jr., Andrew J. Whalen III, Peter F. Boyce, Catherine M. Packwood*, for City of Norcross et al.

*Carothers & Mitchell, Richard A. Carothers, Thomas M. Mitchell, William M. Coolidge III*, for City of Chamblee.