**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 3, 2014**

# In the Court of Appeals of Georgia

A14A0152. GRAHAM v. THE CITY OF DULUTH.

McMILLIAN, Judge.

This is the third appeal that has come before this Court stemming from the events of February 1, 2008, when Matthew Dailey, an intoxicated, off-duty City of Duluth ("the City") police officer, attacked appellant Leresa Graham and others, including another off-duty police officer, Paul Phillips, who came to Graham's aid. In *Dailey v. State*, 313 Ga. App. 809 (723 SE2d 43) (2012), we affirmed Dailey's conviction on multiple crimes against four victims based on his actions that day. In *Phillips v. City of Duluth*, 322 Ga. App. XXIV (March 27, 2013) (unpublished), we affirmed without opinion the trial court's grant of summary judgment to the City of Duluth and two of its police department officials after Phillips filed suit against those defendants seeking damages for the injuries he suffered during the attack. Graham

also brought suit[1] against the City, the two police department officials and Dailey, and after dismissal of her claims against the two police officials,[2] the trial court granted summary judgment to the City on Graham's remaining claims based on respondeat superior and negligent hiring and retention. Graham now appeals from that order.

The relevant circumstances surrounding Dailey's employment with the City of Duluth Police Department ("Department") are as follows. Dailey submitted his application for employment to the Department in September 2002, indicating that he was currently certified as a police officer under Georgia law. The application contained a specific section on drug and alcohol use, under which Dailey indicated that he had never been arrested because of alcohol consumption or drug use, had never been disciplined or terminated from employment because of drug or alcohol use, had never called in sick because of drug or alcohol use, and during the past ten years, had never used alcohol during working hours. Further, Dailey also represented that he had never been arrested or convicted of any criminal offense or placed on

_____

[1] This action was a renewal action from an earlier voluntarily dismissed suit. See OCGA § 9-11-41 (a).

[2] Graham asserted claims under both federal and state law, and the case was initially removed to federal court. The federal court granted summary judgment on the federal claims and on the claims against the police officials and then remanded the case to state court for disposition of the remaining claims.

parole or probation. There is no evidence in the record that any of Dailey's responses were false at the time they were made.

The first employer Dailey listed under the section on employment showed that Dailey currently worked as a "reserve" or "volunteer" motor deputy for the Fulton County Sheriff's Department and that he had done so since 1999. Dailey indicated his job duties included serving warrants, working at the jail, and assisting at special community events, and listed Major Richard Davis as his supervisor. The second employment Dailey listed was his employment by an advertising agency as an ad salesman to used car dealers, and this appeared to be Dailey's paid employment at the time he submitted his application.

Consistent with the Department's Standard Operating Procedures ("Operating Procedures") governing the hiring and selection of new employees, Major Don Woodruff was assigned the task of conducting a pre-employment background check on Dailey. In December 2002, Woodruff obtained a copy of Dailey's officer profile report as maintained by the Peace Officers Standards Training Council ("P.O.S.T."), which reflected that Dailey had obtained his jailer certification and basic law enforcement certification in 2001, and that Dailey's certifications had never been revoked or suspended. Woodruff obtained a copy of Dailey's birth certificate, high

3

school diploma, college certification and driver's license, and performed a criminal background check of Dailey through the GCIC and NCIC, which indicated that Dailey had never been arrested, either in the state of Georgia or anywhere in the country.

As part of the pre-employment investigation, Woodruff was also required to interview Dailey's current and former employers, and Woodruff contacted Stanley Green at the Fulton County Sheriff's Office regarding Dailey's employment there. However, Woodruff indicated on Dailey's "Employment Check Off List" that Dailey was a "reserve" and that Green had no information about Dailey.

Dailey was not hired when he submitted his application in 2002, but a position became available about a year later, and Woodruff scheduled a personal interview with Dailey for September 30, 2003. A notation appearing on the Employment Check Off List indicates Dailey was made a conditional offer sometime around October 3, 2003, which was dependent on his evaluation by a licensed psychologist, which Woodruff arranged. Consistent with the Department's hiring policy, Woodruff also arranged for Dailey to undergo a polygraph examination by an independent polygrapher and a urine screen by an independent entity. Following the completion

4

of these tests, Dailey was deemed fit for duty by the psychologist, drug free, and to have given non-deceptive responses during the polygraph examination.

Unbeknownst to the City, just a few weeks before he was hired, on September 21, 2003, Dailey had been involuntarily committed to a hospital for one night after an incident in his neighborhood ("neighborhood incident"). The record, which includes the incident report and an affidavit from one of Dailey's neighbors, shows that Dailey, while highly intoxicated, brandished his service weapon and two other weapons in front of his neighbors, who persuaded him to turn the guns over to them because of the danger presented by Dailey having guns in such an intoxicated state. However, Dailey, who stated to his neighbors he had so many guns because he was a police officer, asked for his guns back, and when his neighbors refused, he became "very angry," and started to walk toward his house to get more guns he said he had there. At that point Dailey's neighbors became afraid for their safety and went inside and called police.

The police arrived and talked to Dailey. During this conversation, they detected a strong odor of alcohol emanating from Dailey's body and breath. Dailey told the officers that he was a Fulton County Sheriff's Deputy, admitted that one of the weapons he carried to his neighbors' house was his service weapon, and made a

remark to them concerning whether they also carried their weapons when they were off-duty. The officers persuaded Dailey to stay at his house and go to sleep and sober up, and Dailey agreed that he would not go out again.

However, about five to ten minutes after the officers left, Dailey went back outside with a flashlight, which he shined into his neighbor's window. Dailey was using profanity, and the police were again summoned. The officers once again attempted to get Dailey to calm down, but Dailey started yelling words to the effect that he wanted to blow his brains out and then became angry at the officers. The officers tried to persuade Dailey to voluntarily get into their patrol car, and at first he appeared to be cooperating, but then he became belligerent and combative and eventually had to be handcuffed in order to be transported to the hospital for treatment.

On the way to the hospital, Dailey asked one of the police officers if he had ever been addicted to alcohol or drugs and when the officer replied in the negative, Dailey again became combative and attempted to kick out the rear passenger window of the patrol car. Dailey continued to be combative and belligerent after arriving at the hospital, and had to be restrained several times.

The incident report further shows that one of the officers contacted the Fulton County Sheriff's office to see if he could verify that Dailey's worked for them as a Deputy Sheriff. The officer spoke to Fulton County Jail shift commander Lt. Baker, who informed him that he did not know Dailey personally but that he would contact "Major Davis" and notify "O. P. S." The officer also informed Lt. Baker about Dailey's "condition" and that he had been involuntarily committed because of suicide threats. Lt. Baker replied that he would have someone who could verify Dailey's employment contact the officer, but nothing is contained in the record to indicate what follow-up, if any, was done by the Sheriff's office.

As stated above, Dailey started working at the Department shortly after this incident, and the record does not contain any documented issues concerning his work performance after he was hired. However, in March 2005, Dailey advised his supervisor that he needed to take medical leave, and it was ultimately revealed that Dailey requested the leave so that he could participate in an alcohol treatment program. Dailey was scheduled to come back to work in April, and Major Woodruff arranged for him to undergo a psychological evaluation by a licensed psychologist before he could return to work, and, according to Woodruff's affidavit, Dailey was declared fit to return to duty. Dailey also provided a letter from a licensed counselor

7

confirming that he was able to return to work and fulfill his duties. Later, in October 2005, Dailey also provided the City with a certificate showing he had completed a comprehensive evening alcohol and drug treatment program. There is nothing in the record to indicate that there were any reported incidents or performance issues related to Dailey's alcohol use after he returned to work following his treatment in 2005.

The incident in this case occurred almost three years later, on February 1, 2008. The record shows that Dailey came to work early that morning to meet with a solicitor about a court case; the solicitor submitted an affidavit that he was familiar with Dailey from having worked with him before and that at no time, including on that morning, had he ever observed any behavior that indicated Dailey was under the influence of alcohol. Dailey concluded his meeting, and then drove his patrol car to have the oil changed. After he completed that task, Dailey drove his police vehicle back to the station, went off duty and drove home in his personal vehicle. According to Dailey, he has no recollection of later leaving his home or his encounter with Graham.

As to that encounter, the record shows that Graham was traveling on Level Creek Road in Gwinnett County around 1:00 p.m. that day, when she noticed a car, which she thought was an unmarked police vehicle, parked in the roadway with its

8

door open. She immediately saw a man, subsequently identified as Dailey, running in her lane of travel toward her vehicle. Dailey was not in uniform but was putting on a police issued bulletproof vest with a radio attached as he ran. Dailey was doubled over and grabbing his waist as if he was injured. Because it was obvious that "something was going on with a wounded police officer flagging [her] down," Graham rolled up her window and locked her doors, but Dailey flashed his badge and told her he was a police officer and that he was injured and needed help. He also attempted to open her back door but was unsuccessful because it was locked. Graham slightly opened her window, and Dailey asked her to call 911. However, when Graham picked up her cell phone to make the call, Dailey became enraged, screamed at Graham that she was going to ruin his career, slapped the phone out of her hand, grabbed for her head, and sprayed her with pepper spray. Graham rolled up the window with Dailey's arm still inside and screamed for help as Dailey emptied the entire can of pepper spray in her face. Dailey then used the empty can to beat on the window, eventually breaking the glass, and then used the can to strike Graham in the face, telling her he was going to kill her. Although Graham was having difficulty breathing and was mostly blinded by the pepper spray, she continued to scream for help, and other motorists were able to come to her aid and call 911.

9

Although he was off-duty, Officer Phillips happened to be traveling through the area in a marked patrol car and was waved down by another motorist. As Phillips approached Graham's vehicle, Dailey came out from beside the vehicle, and Phillips initially thought he was a fellow officer in need of help.[3] However, Dailey opened fire,[4] and during the ensuing gun battle, both Dailey and Phillips were shot, and both were taken to the hospital for treatment.

Other facts will be set forth as necessary to address Graham's specific claims of error.

1. Graham first contends that the trial court erred by granting summary judgment on her claim based on the doctrine of respondeat superior, arguing a jury should decide whether Dailey was acting "under color" of state law at the time he attacked her. But that is not the test to determine the viability of a respondeat superior claim in this state. *TGM Ashley Lakes, Inc. v. Jennings*, 264 Ga. App. 456, 460- 462 (1) (b) (590 SE2d 807) (2003) (distinguishing and explaining concept of "color of

_____

[3] Phillips formed this opinion because Dailey was wearing a bullet proof vest similar to his own and because Dailey had assumed a "professional police" stance when he came out from behind Graham's car. Like Graham, Phillips also thought that Dailey's vehicle was an unmarked police car.

[4] It is undisputed that Dailey used his Department-issued firearm to shoot Phillips.

employment," used in the negligent/hiring retention context, and "scope of employment" used in respondeat superior cases); see also *Georgia Interlocal Risk Mgt. Agency v. Godfrey*, 273 Ga. App. 77 (614 SE2d 201) (2005) (noting difference between analysis employed in negligent hiring/retention cases and cases involving liability based upon respondeat superior).

The common law principle of respondeat superior is codified in Georgia under OCA § 51-2-2, which provides that "[e]very person shall be liable for torts committed by his . . . servant by his command or in the prosecution and within the scope of his business . . . ." As our Supreme Court has explained, "the test to determine if the employer is liable is whether the employee was acting within the scope of the employee's employment and on the business of the employer at the time of the injury." *Chorey, Taylor & Feil, P.C. v. Clark*, 273 Ga. 143, 144 (539 SE2d 139) (2000). Thus, [t]wo elements must be present to render a master liable under respondeat superior: first, the servant must be in furtherance of his master's business; and, second, he must be acting within the scope of the master's business." (Citation and punctuation omitted.) *Piedmont Hosp. v. Palladino*, 276 Ga. 612, 613 (580 SE2d 215) (2003). Here, it is absolutely undisputed that Dailey was off-duty, intoxicated, and not in any way engaged in his law enforcement duties at the time he attacked

11

Graham. To the contrary, Dailey's criminal conduct in this case was antithetic to his law enforcement duties. "Under Georgia law, 'if a servant steps aside from his master's business to do an act entirely disconnected from it, and injury to another results from the act, the servant may be liable, but the master is not liable.'" (Citation omitted.) Id. at 614. Accordingly, this is one of those plain and palpable cases in which summary judgment was appropriately granted on this claim. Id. at 617; *Clark*, 273 Ga. at 145; *Mountain v. Southern Bell Tel. & c. Co.*, 205 Ga. App. 119, 120 (421 SE2d 284) (1992).

2. Graham also asserted claims based on negligent hiring and negligent retention. As to Graham's claim of negligent hiring, OCGA § 34-7-20 provides that an employer "is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency . . . . Thus, the appellate courts have recognized that an employer may be liable for hiring or retaining an employee the employer knows or in the course of ordinary care should have known was not suited for the particular employment." (Citations and punctuation omitted.) *Munroe v. Universal Health Svcs. , Inc.*, 277 Ga. 861, 862 (596 SE2d 604) (2004).

> Stated differently, a defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have

12

known posed a risk of harm to others where it is reasonably foreseeable from the employee's "tendencies" or propensities that the employee could cause the type of harm sustained by the plaintiff. [*Munroe*, 277 Ga. at 863 (1)].

*Underberg v. Southern Alarm, Inc.,* 284 Ga. App. 108, 110 (643 SE2d 374) (2007).

(a) We turn first to the question of whether the City's pre-employment investigation of Dailey was sufficient to meet its duty of ordinary care in hiring him. "While the standard of ordinary care is invariable, yet circumstances of the case may require a greater amount of care to meet the degree or standard of care required by law. Unsuitability is thus properly determined with reference to the particular position involved." (Citations omitted.) *Munroe*, 277 Ga. at 862 (1), n. 2. Accordingly, "[w]hether or not an employer's investigative efforts were sufficient to fulfill its duty of ordinary care is dependent upon the unique facts of each case," and "employers who fill positions in more sensitive businesses" may be required in the exercise of ordinary care to perform more thorough background investigations. Id. at 864 (2), n. 4.

It is undisputed that the City did not have actual knowledge of Dailey's tendency to drink to excess and then become belligerent and physically aggressive. It also appears to be undisputed that the City had no knowledge that Dailey had, while

13

intoxicated, brandished his service revolver when not on duty or that he owned, and carried, other weapons when not on duty and in a manner that caused others to fear for their safety. However, Graham contends, based on her expert's affidavit, that the City should have done more to investigate Dailey prior to hiring him; specifically that the City should have canvassed Dailey's neighborhood and contacted his supervisor at the Fulton County Sheriff's Office where he worked. Graham contends that had the City taken either of these steps, it would have discovered the 2003 neighborhood incident and realized that Dailey was unsuited to be a police officer. Although we agree with the trial court that canvassing an applicant's neighborhood is not legally required under the facts and circumstances of this case, we find genuine issues of material fact regarding whether the City exercised ordinary care in conducting its pre-employment background check of Dailey.

As stated above, the pre-employment investigation in this case was performed by Major Woodruff pursuant to the Department's Operating Procedures, and a copy of the procedures applicable to pre-screening of potential employees has been included in the record on appeal. According to the Operating Procedures, the pre-employment investigator should, among other things: 1) check the applicant's criminal and driving history; 2) determine the applicant's Georgia P.O.S.T. status; 3)

14

coordinate medical and psychological testing and interviews; 4) ensure that all required documents are available; 5) *interview current and former employers of applicant to determine applicant's work performance record*; 6) interview applicant's personal references; 7) coordinate, where applicable, drug screening, physical agility, polygraph and psychological screening and testing; 8) *inspect employee files at current and/or former employers (post-offer of employment)*; and 9) *complete a background investigation on applications for review*;[5] . . .

The Operating Procedures also contained a separate section on background investigations which were required prior to an applicant being appointed to "new hire" status; these included, at a minimum: 1) verification of the qualifying credentials; 2) review of criminal record; 3) verification of at least three personal references; 4) verification of training achievements; 5) check of employment history; 6) if applicable, verification of citizenship and review of military history; 7) verification of driving record; 8) review of GA POST file; and 9) verification of education. This section also provided that "whenever practical" the background check

---

[5] The Operating Procedures also explain that "[t]he pre-employment background investigation, while costly and time consuming, is the most useful and relevant component of the selection process."

should be conducted in person, although it was permissible to send written forms to references or prior employers.

As stated above, the Employment Check Off List completed by Major Woodruff shows that he called Stanley Green at the Fulton Sheriff's Office, who apparently indicated he had no information about Dailey due to his status as a "reserve" employee. However, it does not appear that Major Woodruff made any attempt to contact someone at the Fulton Sheriff's Office who might have known about Dailey's work performance, and it does not appear Major Woodruff made any attempt to contact Major Richard Davis, although Dailey specifically listed Major Davis as his supervisor on his application when he applied for employment with the City. Moreover, neither the pre-employment check list nor Major Woodruff's affidavit indicates when he called the Fulton Sheriff's Office or whether he attempted to check Dailey's employee file after Dailey was offered a job with the City, as the Operating Procedures seem to require.[6]

---

[6] The record shows that Woodruff sent out several "form" letters to Dailey's former employers, but these have been redacted and the recipients are not discernable. These are attached as Exhibit F to Graham's response to the City's summary judgment motion but not identified. Further, although no specific contact person or information is listed, the check list also indicates that Woodruff contacted Trader Publishing, with whom Dailey was employed as an account representative selling advertising to used car dealerships at the time he submitted his application.

16

These matters are significant for several reasons. The neighborhood incident occurred shortly before Dailey was hired, but approximately one year after Dailey submitted his application to the Department, and the Operating Procedures appear to require the pre-employment investigator to update the information from the applicant's current employment at the time they are offered employment with the City. Further, the incident report from the neighborhood incident indicates the Fulton Sheriff's Office was contacted about the incident, and the officer who took the call was informed about Dailey's "condition" and his involuntary commitment. Moreover, the officer who took that call stated specifically that he would inform Major Davis, whom Dailey listed as his supervisor on his Department application, and who would thus appear to be the person the Department should have contacted while conducting its investigation of Dailey. Thus, an inference arises that if Woodruff had contacted Major Davis at the Sheriff's Office or had examined Dailey's personnel file around the time Dailey was hired, he would have discovered the information about the neighborhood incident, including that Dailey had just been involuntarily committed because his drunken behavior placed his neighbors in fear for their safety and that the incident involved his self-identification as a police officer and use of his service weapon. A jury question exists as to whether such information should have raised at

17

least some question as to Dailey's suitability to be a police officer. Accordingly, properly construing the evidence in Dailey's favor and against the City, see *Govea v. City of Norcross*, 271 Ga. App. 36, 47-48 (6) (a) (608 SE2d 677) (2004), we believe that a jury must decide whether the City exercised ordinary care in conducting its pre-employment background investigation of Dailey.[7] *Underberg,* 284 Ga. App. at 111 (1).

(b) However, that does not end our inquiry, because even if the City did not adhere to proper procedures in hiring Dailey, "absent a causal connection between the employee's particular incompetency for the job and the injury sustained by the plaintiff, the defendant employer is not liable to the plaintiff for hiring an employee with that particular incompetency." *Munroe*, 277 Ga. at 862 (1). Although the trial court found that there was no evidence that Dailey had ever inappropriately discharged his pepper spray or committed an assault on an innocent civilian prior to the February 8 incident, we do not believe the test is that narrow. Rather, to establish the vicarious liability of the employer for the employee's acts, it must be "reasonably foreseeable from the employee's 'tendencies' or propensities that the employee could

---

[7] Although it may have been of obvious benefit in this case, we decline to impose a general duty on the City to conduct a canvas of a prospect's neighborhood prior to hiring him or her as a police officer. See *Munroe*, 277 Ga. at 864, n.4.

18

cause the type of harm sustained by the plaintiff. 'The employer is subject to liability only for such harm as is within the risk.' Restatement (Second) of Agency, § 213 Comment (d)." *Munroe*, 277 Ga. at 863.[8]

Here, contrary to the trial court's findings, we believe that a jury could conclude that Dailey's propensity to get extremely intoxicated, brandish his service weapon before innocent bystanders, and become belligerent and irrational when questioned or contradicted made him unsuitable to be placed in a position where he would be issued weapons, including pepper spray, which was used in the attack on Graham. Moreover, we note that the City's Operating Procedures recognize the danger of officers carrying firearms while consuming alcoholic beverages, and specifically prohibits them from doing so. Thus, "the evidence would authorize a jury to conclude that [the City] might have foreseen that personal injury would result from hiring and retaining an officer with [Dailey's] history . . . ." *Govea*, 271 Ga. App. at 49 (6) (b).

_____

[8] In adopting this standard, our Supreme Court in *Munroe* rejected plaintiff's "but for" argument that the employer was liable for negligent hiring or retention of the employee solely because his employment provided him access or opportunity to injure the plaintiff and likewise disapproved language in prior opinions to the effect that a plaintiff in such a case must show the employee's propensity to commit the precise tortious or criminal act that caused plaintiff's injury. *Munroe*, 277 Ga. at 863-864.

(c) We must still consider, however, whether Dailey, who was off-duty and not performing any official duties at the time of the attack on Graham, was nevertheless acting "under color of employment" at that time.

> In [the whole court case of] *TGM Ashley Lakes v. Jennings,* [264 Ga. App. at 459 (1) (a)], this Court decided that "liability does not attach if the employee committed the tort in a setting or under circumstances wholly unrelated to his employment." *TGM* established that an employer may be held liable for torts committed outside the scope of employment, at least where a relationship exists between the employer and the tort victim. "The question is not whether the servant was acting within the scope of his authority, but whether in view of his known characteristics such an injury by him was reasonably to be apprehended or anticipated." Still, the act must be committed "within the tortfeasor's working hours or under the color of employment."

(Citations omitted.) *Underberg*, 284 Ga. App. at 113 (2). *Harvey Freeman & Sons, Inc. v. Stanley*, 259 Ga. 233, 234 (1) (378 SE2d 857) (1989); *Govea*, 271 Ga. App. at 49 (6) (c). Thus, "even for employers who should have known of the dangerous propensities of an employee, they will not be liable if the employee acts on those propensities in a setting or under circumstances wholly unrelated to his employment." *TGM*, 264 Ga. App. at 462 (1).

The question then is whether the attack on Graham was "wholly unrelated" to Dailey's employment as a police officer. Although this is a close case, we think this question must be decided by a jury. Although it is true that Dailey was off-duty and not engaged in any law enforcement duties at the time he attacked Graham, he made several objective displays of authority to Graham, including telling her that he was a police officer, putting on his vest with his radio attached, showing her his badge, and instructing her to summon him help. He then became enraged when she did as he instructed, and attacked her with his Department issued pepper spray before engaging in a shoot out with his Department issued service weapon, striking Graham's car and a fellow officer who came to the scene to help. Thus, it appears that he used his position as a police officer to gain access to, and greater control over, Graham's actions and responses to what she sensed was a dangerous situation. Thus, a jury must decide whether Dailey was acting under color of employment at the time he attacked Graham. *Underberg,* 284 Ga. App. at 113 (2) (jury issue whether ex-employee acting under color of employment of former employer alarm company at the time of his attack on the plaintiff); *Govea*, 271 Ga. App. at 49 (6) (b) (jury issue whether employee used his status as a police officer to gain access to the victim).

"Issues of negligence, including failure to exercise ordinary care and the foreseeability of criminal behavior, are not ordinarily susceptible of summary adjudication." *Munroe*, 277 Ga. at 866 (2). Because the evidence here is not plain, palpable and undisputable, we must reverse the grant of summary judgment to the City on Graham's negligent hiring claim.

3. However, we reach a different result with respect to Graham's negligent retention claim, which was based on the City's decision to allow Dailey to return to work after he took a medical leave of absence to obtain treatment for issues related to alcohol. At the time that Dailey took this leave, the City had not been alerted to any performance or work issues related to Dailey's use of alcohol. And even if his request for leave alerted the City that Dailey had a problem with alcohol, it had no actual knowledge or reason to suspect that Dailey became belligerent and physically and verbally combative when drinking. Nor did the City know when Dailey sought treatment that he would use his service weapon in an inappropriate manner while under the influence. In sum, the City did not have actual knowledge of any facts which would have alerted them to the extent of Dailey's problem or that his use of alcohol might cause him to act in an unsuitable or dangerous manner. Further, the City took steps to ensure that Dailey was fit to return to work following his treatment,

22

and we cannot say that the City should have taken any additional steps prior to allowing him to do so. Thus, we find the trial court properly granted summary judgment on Graham's negligent retention claim. *Mountain*, 205 Ga. App. at 120-121 (2).

3. In light of our determination that a jury must decide whether the City should be held vicariously liable for Graham's injuries, we need not consider her contention that the City failed to provide proper evidence in support of its motion for summary judgment. Further, to the extent that any of the alleged evidentiary deficiencies pertained to Graham's negligent hiring claim, we find that Woodruff's affidavit was sufficient to establish the measures that the City took prior to allowing Dailey to return to work.

*Judgment affirmed in part and reversed in part. Phipps, C. J., and Ellington, P. J., concur.*