A05A0324. GEORGIA INTERLOCAL RISK MANAGEMENT AGENCY v. GODFREY et al.
(614 SE2d 201)

RUFFIN, Chief Judge.

Georgia Interlocal Risk Management Agency (GIRMA) brought this declaratory judgment action to determine coverage for an underlying wrongful death claim. Although the trial court denied GIRMA's motion for summary judgment, it issued a certificate of immediate review. We granted GIRMA's application for interlocutory appeal, and this appeal followed. For reasons that follow, we reverse.

Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law.[1] We review a trial court's summary judgment ruling de novo, construing the facts and all reasonable inferences in favor of the nonmoving party.[2]

---

[1] See *Howard v. J. H. Harvey Co.*, 239 Ga. App. 677, 678 (521 SE2d 691) (1999).

[2] See id.

Viewed in this manner, the evidence shows that, in the early morning hours of December 3, 2001, Marvin Godfrey was robbed and murdered in Wilkinson County. A jury subsequently found LaRodney Carswell, a City of McIntyre police trainee, guilty of the robbery and murder. After learning of Carswell's involvement in the crimes, Godfrey's family filed a wrongful death action against Carswell, the City of McIntyre ("the City"), and various city officials and employees.

GIRMA is a statutory association formed by municipalities pursuant to OCGA § 36-85-1 et seq.[3] Although not an insurance company or "insurer" governed by Title 33 of the Georgia Code,[4] GIRMA provides a mechanism for municipalities to pool their general liability, motor vehicle liability, and property damage risks.[5] A municipality that enters a GIRMA coverage agreement in effect purchases liability insurance.[6]

In 1998, the City entered a GIRMA coverage agreement that provided combined automobile, crime, liability, and property coverage. This agreement was binding and in effect at the time of Godfrey's death. Pursuant to the agreement, GIRMA provided defense counsel for the City and several other defendants. Although Carswell did not tender the claim against him for coverage, GIRMA also provided him with a defense under a reservation of rights clause. It then filed this declaratory judgment action to ascertain its coverage obligations as to Carswell.

Arguing that, as a matter of law, it is not obligated to provide coverage or a defense to Carswell for claims arising out of Godfrey's death, GIRMA moved for summary judgment. The trial court denied the motion,[7] and this appeal followed.

On appeal, GIRMA asserts that the coverage agreement precludes coverage for Carswell. The agreement's casualty coverage section obligates GIRMA

> to pay on behalf of the Member all sums which the Member shall be obligated to pay as money damages by reason of "Liability" imposed upon the Member by law or assumed by the Named Member under contract or agreement; for damages direct or consequential, arising out of any occurrence

---

[3] See OCGA § 36-85-1 (7).

[4] See OCGA § 36-85-4.

[5] See OCGA § 36-85-2 (a).

[6] See *CSX Transp. v. City of Garden City*, 277 Ga. 248, 251 (2) (588 SE2d 688) (2003).

[7] Before the trial court finally ruled on GIRMA's summary judgment motion, the wrongful death suit proceeded to trial, resulting in a mistrial. The parties stipulated that all matters of record in the wrongful death suit, including the trial transcript, be made part of the record and considered in the declaratory judgment action. In denying GIRMA's summary judgment motion, the trial court considered the record from the wrongful death suit.

from any cause including, but not limited to: "Bodily Injury", "Host Liquor Liability", "Incidental Malpractice", "Law Enforcement Liability", "Personal Injury", "Products Liability", "Property Damage", or "Completed Operations Liability" happening during the period of the Coverage provided under this Agreement.

The agreement defines the term "Member" as the City and any "[e]mployee . . . acting for and on behalf of the [City] and under its direction and control or appointed by the [City] while acting within the scope of [his] duties as such." Citing this language, GIRMA argues that Carswell was not a "Member" under the agreement — and thus not entitled to coverage — when he participated in the robbery and murder of Godfrey. We agree.

The record shows that, on the night of the murder, Carswell stopped by the McIntyre police station to borrow a patrol car. According to police officer Josh Hasty, the only officer on duty that night, Carswell stated that his brother was using his personal vehicle. Thus, Carswell said, he needed to take a patrol car home so that he could drive it to work the next morning. Hasty knew that Carswell had permission to drive a patrol car to the police academy, so he did not question Carswell's use of the car, and Carswell took the patrol unit. Later that night, Carswell returned the car to the police station, indicated that he no longer needed it, and Hasty drove him home.

The next day, Carswell gave several statements to Georgia Bureau of Investigation (GBI) agents regarding Godfrey's murder. He initially admitted to no involvement in the murder, stating that he drove the borrowed police car directly home from the police station and, when he found that he did not need the car, returned it. In subsequent statements, however, he admitted to greater involvement in the crimes.

During his second GBI interview, Carswell told agents that he drove the police car to the county line to meet Casey Howell, a drug dealer who claimed Carswell owed him money. According to Carswell, he informed Howell that he could borrow money from Godfrey, and they planned to obtain the money that night. Howell got into the police car with a rifle, and Carswell drove to Godfrey's workplace. As Godfrey left work shortly after midnight, Carswell followed him in the police car. At some point, Carswell flashed the police car's lights, stopped Godfrey, and pulled up beside him. Godfrey indicated that he had some money for Carswell, then followed Carswell's car to a dark area by the side of the road. When Carswell got out of the car to borrow the money from Godfrey, Howell shot Godfrey. Carswell took what appeared to be a bank envelope from Godfrey, gave it to Howell, and later returned the police car to the police station.

At a subsequent interview, Carswell's story changed again. Carswell admitted that, prior to the night of the murder, he and Howell had agreed to rob and "scare" Godfrey. Carswell told Howell that Godfrey carried a certain amount of money, and he provided Howell information about where and when Godfrey worked. Based on this information, they decided to rob Godfrey as he drove home from work on December 3, 2001. Howell brought a rifle to scare Godfrey, and Carswell used the police car's blue lights to stop Godfrey. Once Godfrey exited his car, Howell shot him. Carswell then took an envelope of money from Godfrey and left Godfrey by the side of the road.

Noting that Carswell ultimately admitted his involvement in Godfrey's robbery and murder, GIRMA argues that, as a matter of law, Carswell was not acting on behalf of or under the City's direction and control at the time of the crimes. The Godfrey family, on the other hand, asserts that questions of fact remain as to whether Carswell was acting with the authority of and under the control of the police department when he used the police car to stop Godfrey.[8] It contends that Hasty, a certified police officer, allowed Carswell to use the car and facilitated that use.

As noted above, OCGA § 36-85-1 et seq. permits municipalities to pool general liability risks.[9] And "general liability" under this statutory scheme is defined as "liability for bodily injury, death, or damage to property owned by others to which a municipality . . . may be subject either directly or by reason of liability arising out of an act, error, or omission of its employee, agent, or officer *in the course and scope of employment*."[10] This same principle is evident in the coverage agreement's definition of "Member," which includes employees acting for and on behalf of the City and under its direction and control or appointed by the City and acting within the scope of their duties.

The statutory and coverage language is similar to that used by our courts in applying the theory of respondeat superior. Under such theory, an employer is liable for the torts of an employee if "the employee was acting in the scope of [his] employment and on the business of the employer at the time of the injury."[11] Thus, " 'the test of liability is whether the tort was done within the scope of the actual

---

[8] In the wrongful death complaint, the Godfrey family alleged claims against Carswell based on the intentional torts of assault and battery, as well as negligence. As to negligence, the family asserted that Carswell negligently allowed another individual (Casey Howell) to be in a position of authority when Godfrey was killed and negligently allowed the police car to be used in an assault.

[9] See OCGA § 36-85-2 (a) (1).

[10] (Emphasis supplied.) OCGA § 36-85-1 (4).

[11] *Nelson v. Silver Dollar City*, 249 Ga. App. 139, 145 (4) (547 SE2d 630) (2001).

transaction of the master's business for accomplishing the ends of his employment.' "[12] Respondeat superior does not apply unless an employee is acting for and on behalf of the employer or within the scope of employment.[13] Moreover, an employer generally is not liable for the activities of an employee exercising an independent business unless the employee is subject to the employer's immediate direction and control.[14]

Given the similarities in language, we find cases involving respondeat superior helpful in determining whether Carswell qualifies as a "Member" under the coverage agreement. These cases make clear that "[i]f a tortious act is committed not in furtherance of the employer's business, but rather for *purely personal reasons* disconnected from the authorized business of the master, the master is not liable."[15] Thus, "where a tort occurs while an employee has stepped aside from his employer's business to do an act entirely disconnected from that business, the employer has no liability."[16] But, if the act falls within the class of activities performed on behalf of the employer, the employer is bound.[17]

Applying these principles, we agree with GIRMA that Carswell is not a "Member" under the coverage agreement for purposes of the Godfrey family's lawsuit. Although Carswell was driving a City police car at the time of the crimes, the robbery and murder did not take place during Carswell's work shift, and Carswell told Hasty that he needed the police car to drive himself to work the next day, not to perform police activity that night. Police department policies arguably permitted Carswell to use a police car for transportation to and from work. But as a police trainee, he had no arrest powers or authority to stop Godfrey using the car's blue lights. And Carswell stopped Godfrey for his own personal reasons, rather than any purpose related to the City or law enforcement. In short, he wanted money from Godfrey — whether through a loan agreement or robbery — to pay off a drug dealer.

Carswell did not commit any of the acts at issue here on behalf of the City or its police department. On the contrary, Carswell acted for purely personal reasons, completely disconnected from the authorized business of his employer. Nothing he did accomplished " 'the

---

[12] Id.

[13] See *Munroe v. Universal Health Svcs.*, 270 Ga. App. 320, 321 (3) (605 SE2d 928) (2004); *Gooden v. Day's Inn*, 196 Ga. App. 324, 327 (3) (395 SE2d 876) (1990) (physical precedent only).

[14] See OCGA § 51-2-4.

[15] (Punctuation omitted; emphasis in original.) *Piedmont Hosp. v. Palladino*, 276 Ga. 612, 613-614 (580 SE2d 215) (2003).

[16] *Nelson*, supra.

[17] See *Howard*, supra at 681 (5).

ends of his employment,' "[18] which required that he "serve and protect innocent citizens." Moreover, the City was not exercising any direction or control over him at the time he committed the acts, and he certainly was not operating within the scope of his employment as a police trainee at that time.[19]

On appeal, the Godfrey family argues that testimony from two of its experts raises questions of fact as to whether Carswell was "on duty" and representing the McIntyre Police Department at the time of Godfrey's robbery and murder. Specifically, William Kicklighter, former police chief for Dougherty County and the City of Cartersville, testified that a police department employee riding in a patrol car is necessarily "on duty" and represents the full power and force of the police department. Thus, according to Kicklighter, "[n]o civilian, approached by a patrol car or an officer with a badge, has the right to question whether the officer is on duty or not. Rather, the approached individual must respond appropriately to a patrol car which engages its blue lights." Eldrin Bell, former chief of police for the City of Atlanta, similarly testified that, given Carswell's operation of the police car, the "public" would have viewed him as a police officer, notwithstanding his "trainee" status. As Bell testified: "when you're in that police car with all of those markings, you are indeed a police officer."

Based on this testimony, the Godfrey family asserts that a police department employee driving a police car has the apparent authority of the police department. But regardless of how the public might have viewed Carswell's use of the police car, he stepped aside from his police employment and performed acts for entirely personal reasons that led to the robbery and murder of Godfrey. To find that Carswell took these actions while acting for and on behalf of the City, under its direction or control, or within the scope of his employment would require us to disregard the facts of the case.

The Godfrey family also argues that our decision in *Isdoll v. Scottsdale Ins. Co.*,[20] compels us to affirm the trial court's ruling. In *Isdoll*, a jailer sexually assaulted an inmate at the jail. The inmate sued the jailer and his employer. The employer's insurer subsequently denied coverage for the claims against the jailer, filed a declaratory judgment action, and moved for summary judgment,

---

[18] *Nelson*, supra.

[19] See id. at 145-146; *New Madison South Ltd. Partnership v. Gardner*, 231 Ga. App. 730, 732-733 (1) (499 SE2d 133) (1998). Cf. *Howard*, supra at 681 (because store security guard approached suspected shoplifter to accomplish ends of employment – to prevent shoplifting – and for no personal reason, question of fact remained as to whether employer could be held liable for guard's tortious actions under respondeat superior theory).

[20] 219 Ga. App. 516 (466 SE2d 48) (1995).

which the trial court granted. Although the parties agreed that the jailer was an "insured" under the policy, the insurance company claimed that the inmate's injuries did not arise out of the performance of law enforcement duties, as the policy required. We ultimately rejected this argument, finding that the jailer "was, at the time of the incident, performing his duties as a jailer and took advantage of his position to accomplish his ends."[21] Thus, the policy terms did not bar coverage for the jailer's conduct.[22]

The *Isdoll* decision, which turned on the specific language of the applicable insurance policy, does not control here. The cases involve different coverage language and are factually distinguishable. Unlike the jailer in *Isdoll,* Carswell did not participate in Godfrey's murder and robbery while actually performing the functions for which he was employed. Moreover, under Georgia law, an employee who steps outside of his employment to participate in purely personal conduct exceeds the scope of his employment, even if his employment put him in a position to accomplish the act.[23]

As a matter of law, Carswell was not a "Member" under the coverage agreement when he committed the acts giving rise to the Godfrey family's claims. Accordingly, the trial court erred in denying GIRMA's motion for summary judgment.[24]

*Judgment reversed. Johnson, P. J., and Barnes, J., concur.*

DECIDED APRIL 21, 2005 — ▆▆▆▆▆▆▆▆▆

*Mullins, Whalen & Westbury, Andrew J. Whalen III, James R. Westbury, Jr.,* for appellant.

---

[21] Id. at 518 (1).

[22] See id.

[23] See *Piedmont Hosp.,* supra at 615 (hospital is not vicariously liable for employee's sexual misconduct regarding patient simply because employee's employment allowed him access to patient's room and provided him an opportunity to commit tortious act).

[24] In a supplemental brief filed with this Court, the Godfrey family also asserts that our recent decision in *Govea v. City of Norcross,* 271 Ga. App. 36, 49 (6) (c) (608 SE2d 677) (2004), supports the trial court's ruling. We disagree. The *Govea* decision addressed whether a city had negligently hired and retained a police officer. It did not apply the principles of respondeat superior that we have employed in analyzing this case. As we recently noted, liability based upon respondeat superior is not equivalent to liability based upon negligent hiring and retention. See *TGM Ashley Lakes v. Jennings,* 264 Ga. App. 456, 460-462 (1) (b) (590 SE2d 807) (2003). Moreover, the *TGM* decision specifically overruled a prior case that had equated the term "color of employment," which is used in the negligent hiring/retention context, with the concept of "scope of employment." See id. at 461-462.

*Chambless, Higdon, Richardson, Katz & Griggs, Norman C. Pearson III, Bell & Bell, David B. Bell, Spivey, Carlton & Edenfield, J. Franklin Edenfield, Jerry D. McRee, Michael J. Moses,* for appellees.

LaRodney Carswell, *pro se.*