**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 17, 2022**

# In the Court of Appeals of Georgia

A21A1595, A21A1596. GEORGIA SCHOOL BOARDS
   ASSOCIATION RISK MANAGEMENT FUND v. ROYAL
   et al.; and vice versa.

MARKLE, Judge.

After teacher Louise Royal was violently attacked at school by Neotha Fedd, the parent of a student, she and her husband filed a civil suit against Fedd and obtained a default judgment against her. Royal then sued the Georgia School Boards Association Risk Management Fund, Inc. ("the Fund") as Fedd's judgment creditor, seeking to collect the default judgment under a Casualty & Crime Coverage Agreement ("the Agreement") between it and the Seminole County Board of Education (BOE). The trial court denied both parties' summary judgment motions on the issue of whether Fedd was covered under the provisions of the Agreement. The trial court further granted summary judgment in favor of Royal and against the Fund,

finding that the Agreement's exclusion for willful violations of a penal statute was unenforceable as a matter of law. In a separate order, the trial court also granted Royal's motion in limine to exclude Fedd's criminal conviction. Both parties now appeal.

In Case No. A21A1595, the Fund contends that the trial court erred by denying its summary judgment motion, arguing that Fedd was not covered by the Agreement because she did not qualify, and was not acting, as an authorized volunteer of the school at the time of the attack. The Fund further asserts that the trial court erred by granting summary judgment in Royal's favor because the Agreement excluded coverage for the wilful violation of a criminal statute, thus barring recovery for Fedd's attack on Royal. Finally, the Fund argues that the trial court abused its discretion in excluding Fedd's criminal conviction from evidence. In Case No. A21A1596, Royal argues that the trial court erred in denying her summary judgment motion by instead finding that there remained a question of fact as to whether Fedd was covered under the Agreement as an authorized volunteer at the school on the day of the attack. Because we conclude that Fedd was not covered under the Agreement, we reverse the trial court's denial of the Fund's summary judgment motion and

2

remand the cases to the trial court with instruction to enter judgment in the Fund's favor.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, . . . [a] moving party, must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citation omitted.) *In/Ex Systems v. Maud*, 352 Ga. App. 722, 723 (2) (835 SE2d 799) (2019).

So viewed, the record shows the following. One morning in May 2013, Royal, a teacher, was working as a hall monitor at the Seminole County elementary school before classes began when she encountered Fedd. Fedd had a first grader who attended the school and was scheduled to participate in a field trip that day. Without provocation, Fedd violently attacked Royal, causing her permanent injuries.[1]

---

[1] Royal received workers' compensation benefits as a result of her injuries. Thus, the BOE is not named as a defendant. See *Mullinax v. Pilgrim's Pride Corp.*, 354 Ga. App. 186, 188 (1) (a) (840 SE2d 666) (2020) (OCGA § 34-9-11 (a) of the Workers' Compensation Act "provides the employee's exclusive remedy against his

3

The BOE carries a self-insurance policy through the Fund, which is an interlocal risk management agency, or self-insurance fund, that provides liability coverage to member school systems. The Fund issued the Agreement to the BOE, effective July 2012 through July 2013, which covered the BOE as "the Named Member" as well as certain designated individuals when they are "authorized" by the BOE or acting within the scope of their employment.

The parties dispute whether Fedd was covered by the Agreement as an authorized volunteer at the school. Specifically, in the "Common General Conditions" section of the Agreement, it provides:

> It is agreed that the unqualified word 'Member' wherever used in this coverage document includes not only the Named Member but also; . . . [a]ny of the following, within the scope of their employment, or authorized by the Named Member; . . . (2) Authorized Volunteers[.]

The Agreement does not define the term "authorized."

Following the attack, Royal made demand upon the Fund for the coverage limit, contending that the Agreement covered the actions of Fedd. Royal asserted that Fedd was covered not under the "Bodily Injury and Property Damage Liability"

employer and precludes recovery on a tort claim by an injured employee against his employer.") (citation omitted).

sections of the Agreement, but under "the Personal and Advertising Injury Liability" provisions, which extend coverage to "[p]ersonal injury caused by an offense arising out of the Named Member's business[.]"[2] The Agreement defines "personal injury" as an injury, other than bodily injury, arising out of offenses including "false arrest, detention or imprisonment." However, the Agreement also excludes coverage for "[p]ersonal injury . . . arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the Member." In response to Royal's demand, the Fund denied coverage.

After Fedd was tried and convicted for her attack, Royal and her husband filed a civil suit against Fedd ("the underlying action"), asserting claims for negligence and negligence per se; false arrest, detention or imprisonment; assault and battery; negligent and intentional infliction of emotional distress; civil rights violations; loss of consortium; and compensatory and punitive damages. Royal ultimately obtained a default judgment against Fedd in the amount of $1,850,000. Royal then filed the instant suit against the Fund as Fedd's judgment creditor.[3]

---

[2] Royal conceded below there was no coverage for her claims under the "Bodily Injury and Property Damage Liability" provision of the Agreement.

[3] This action was originally filed in Pulaski County Superior Court, and subsequently transferred to Gwinnett County Superior Court per the parties'

Both parties filed motions for summary judgment on the issue of whether the Agreement covered Fedd. The Fund argued that Fedd was not covered under the Agreement because she was neither an authorized volunteer in general at the time of the attack nor was she authorized by the BOE when she attacked Royal. It also asserted that, even if Fedd fell within the Agreement's coverage, the exclusion for the willful violation of a penal statute barred coverage.

In her motion, Royal argued that, at the time of the attack, Fedd was an authorized volunteer as a matter of law, and thus, coverage applied. Royal contended the Agreement's willful violation of a penal statute exclusion was unenforceable because the policy exclusion conflicts with other provisions providing coverage.

Following a hearing, the trial court concluded that there was a factual dispute as to whether Fedd was covered under the Agreement, and thus, it denied both motions for summary judgment on this issue. . The trial court also found that the Agreement's willful violation of a penal statute exclusion was unenforceable as a matter of law, and thus it granted Royal's summary judgment motion and denied the Fund's motion on this issue. . These appeals followed.

---

agreement. The current case is a renewal action pursuant to OCGA § 9-11-41.

1. In Case No. A21A1595, the Fund contends that the trial court erred by denying its summary judgment motion because the Agreement provides no coverage to Fedd. In so arguing, the Fund admits that while Fedd was approved to serve as a volunteer at the school, to be covered under the Agreement, she must have been "authorized" to act on behalf of the school at the time of the attack. It further contends that the admissible evidence shows that Fedd was only at the school for personal reasons — visiting her son's teacher — at the time of the assault, and thus was not acting on the school's behalf.

In response, and in her cross-appeal in Case No. A21A1596, Royal contends that the Fund is collaterally estopped from re-litigating whether Fedd was an authorized volunteer under the Agreement. She further argues that, under the plain language of the Agreement, Fedd was only required to be approved or authorized as a volunteer, having general volunteer privileges at the school, in order to be covered. She disputes that the Agreement required Fedd to have been acting as a volunteer at the time of the attack for coverage to apply. Regardless, Royal contends some evidence shows that Fedd was, in fact, at the school acting as a volunteer on the day of the attack. We address each argument in turn, concluding that the Fund is not

7

collaterally estopped from arguing that Fedd was not an authorized volunteer, and further concluding that the Agreement did not cover Fedd.

(a) *Collateral estoppel*.

As a preliminary matter, Royal asserts that the Fund is collaterally estopped from arguing that Fedd was not an authorized volunteer under the Agreement because of Fedd's admission when she failed to file an answer in the underlying action. We disagree.

The doctrine of collateral estoppel precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies. Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions. However, unlike res judicata, collateral estoppel does not require identity of the claim — so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim. Furthermore, collateral estoppel only precludes those issues that actually were litigated and decided in the previous action, or that necessarily had to be decided in order for the previous judgment to have been rendered. Therefore, collateral estoppel does not necessarily bar an action merely because the judgment in the prior action was on the merits. Before collateral

8

estoppel will bar consideration of an issue, that issue must actually have been decided.

(Citation omitted.) *Pollard v. Queensborough Nat. Bank & Trust Co.*, 356 Ga. App. 223, 228 (3) (844 SE2d 894) (2020). Accordingly, three prerequisites must be satisfied before collateral estoppel applies: (1) the issue must have been actually decided in a prior action, (2) the parties in the current action must have been parties or in privity with the parties of the prior action, and (3) the issue decided in the prior action must have been essential to the judgment. *Atlanta Cas. Ins. Co. v. Gardenhire*, 248 Ga. App. 42, 43 (1) (545 SE2d 182) (2001); *Kent v. Kent*, 265 Ga. 211 (1) (452 SE2d 764) (1995) ("collateral estoppel applies where an issue of fact or law is actually litigated and determined by a valid judgment, and the determination is essential to the judgment. That determination is then conclusive in a subsequent action between the same parties.").

In the complaint in the underlying action against Fedd, Royal alleged that, "[a]t the time of the attack, [Fedd] was lawfully on the school premises and was an authorized volunteer[.]" However, whether Fedd was a volunteer within the meaning of the Agreement at the time she attacked Royal was not an issue *actually* decided by the trial court in the underlying action. The trial court made no specific finding as to

9

coverage. Nor was the determination of this issue essential to the underlying default judgment against Fedd. In this regard, Royal's reliance on *Gardenhire*, 248 Ga. App. at 43 (1), is misplaced. In that case, the fact essential to the judgment, who was driving the car, was actually decided and necessary to the judgment in the underlying case. Id. Here, however, Fedd's volunteer status was not an essential issue to the default judgment entered in the underlying action. In fact, the trial court specifically found in its final order and judgment that Fedd was at the school "seeking to meet with another teacher," not that Fedd's presence was as an authorized volunteer.

Moreover, because the Fund denied coverage to Fedd and did not participate in the underlying litigation, it did not share an identity of interest with her such that she represented any interests of the Fund. *ALR Oglethorpe v. Henderson*, 336 Ga. App. 739, 743-744 (1) (b) (783 SE2d 187) (2016). Therefore, we conclude that the Fund is not collaterally estopped from litigating Fedd's volunteer status under the Agreement.

(b) *Whether Fedd was an authorized volunteer under the Agreement.*

Turning to the issue of whether Fedd was an authorized volunteer covered under the Agreement at the time she attacked Royal, we conclude she was not.

"Although [the Fund] is not technically an insurance company or insurer, we apply principles of insurance law in analyzing coverage issues." See *Ga. Interlocal Risk Mgmt. Agency v. City of Sandy Springs*, 337 Ga. App. 340, 343 (788 SE2d 74) (2016). And the construction and interpretation of a contract are matters of law for the court. *Old Republic Nat. Title Ins. Co. v. RM Kids*, 352 Ga. App. 314, 317 (1) (835 SE2d 21) (2019).

> As with any contract, in construing the terms of an insurance policy, we look first to the text of the policy itself. Words used in the policy are given their "usual and common" meaning, . . . and the policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney. Where the contractual language is explicit and unambiguous, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured. This is so because Georgia law permits an insurance company to fix the terms of its policies as it sees fit, so long as they are not contrary to the law, thus companies are free to insure against certain risks while excluding others. However, when a policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous and, . . . will be construed strictly against the insurer/drafter and in favor of the insured.

(Citations and punctuation omitted.) *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 719 (784 SE2d 422) (2016); see also *Joseph v. Certain Underwriters of Lloyd's*

11

*London*, 356 Ga. App. 178, 180 (844 SE2d 852) (2020). "Construction of an insurance policy is governed by the ordinary rules of contract construction, and when the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent." (Citations and emphasis omitted.) *Auto-Owners Ins. Co. v. Hale Haven Properties*, 346 Ga. App. 39, 43 (1) (a) (i) (815 SE2d 574) (2018); see also *Ga. Farm Bureau Mut. Ins. Co.*, 298 Ga. at 719. We consider the policy as a whole, to give effect to each provision, and to interpret each provision to harmonize with each other. See *Old Republic Nat. Title Ins. Co.*, 352 Ga. App. at 317 (1); see also *Southern Trust Ins. Co. v. Mountain Express Oil Co.*, 351 Ga. App. 117, 120-121 (828 SE2d 455) (2019). Georgia law disfavors construing policies in a manner that renders any provision meaningless or mere surplusage. *Sharpe v. Great Midwest Ins. Co.*, 344 Ga. App. 208, 210-211 (1) (808 SE2d 563) (2017); *Southern Fire & Cas. Co. v. Jamerson,* 223 Ga. App. 582, 583 (1) (479 SE2d 404) (1996). Moreover, words should be understood in relation to each other. See *Wilson v. Clark Atlanta Univ.*, 339 Ga. App. 814, 834 (2) (c) (794 SE2d 422) (2016). With these principles in mind, we turn to the specific terms of the Agreement at issue.

In looking to the plain language of the Agreement, it provides coverage to the Named Member and also to any "Authorized Volunteers" acting within the scope of

their employment, or as authorized by the Named Member. The Agreement does not define the term "authorized."[4] Specifically, the Agreement provides: "It is agreed that the unqualified word 'Member' wherever used in this coverage document includes not only the Named Member but also [a]ny of the following, *within the scope of their employment, or authorized by the Named Member; . . . (2) Authorized Volunteers[.]*" (Emphasis supplied). When read together, we conclude that, for coverage to be triggered, Fedd must have been an authorized volunteer, acting as such, at the time she attacked Royal. See *Auto-Owners Ins. Co.*, 346 Ga. App. at 43 (1) (a) (i); see also *Old Republic Nat. Title Ins. Co.*, 352 Ga. App. at 317 (1); *Southern Trust Ins. Co.*, 351 Ga. App. at 120-121; *Sharpe*, 344 Ga. App. at 211 (1); *Wilson*, 339 Ga. App. at 834 (2) (c).

But, Fedd was not acting in the capacity of an authorized volunteer within the meaning of the Agreement at the time of the attack on Royal. While it is undisputed that Fedd had undergone a background check and was approved to serve in a volunteer role, and apparently had done so in the days prior to the incident, the

---

[4] Despite the plain language of the Agreement, Royal urges us to equate the terms "approved volunteer" and "authorized volunteer." The record shows that the school used the term "approved volunteer" to identify those individuals permitted as school volunteers. As indicated by the school principal, once a person has cleared a background check, they are then placed on a list of approved volunteers.

testimony of the school's principal indicated that individuals could be at the school for personal reasons and not acting in any volunteer capacity. The principal's uncontradicted testimony clarified that one can be an approved volunteer, but yet not necessarily acting as a volunteer at any given time.

Royal contends the evidence is in conflict as to Fedd's reason for being at the school that morning.[5] Regardless of whether there was conflicting evidence concerning the reasons for Fedd's presence that day, the plain language of the Agreement shows that, in order to be covered, Fedd must have not only been acting as an authorized volunteer at the time of the attack, but her actions must have also been within the scope of that authorization. And there is no evidence that Fedd was acting within the scope of her authorization as a volunteer at the time of the assault.

In reaching our conclusion here that there is no coverage under the Agreement, our decision in *Ga. Interlocal Risk Mgmt. Agency v. Godfrey*, 273 Ga. App. 77 (614 SE2d 201) (2005), is instructive. In *Godfrey*, we examined the City of McIntyre's ("City") liability coverage agreement in a declaratory judgment action, holding that

---

[5] The principal testified that when she encountered Fedd the morning of the attack, Fedd advised her she was there to meet with her son's teacher, and the principal indicated that there was no volunteer activity at the school that day. Conversely, other school personnel, who testified at Fedd's criminal trial, indicated that there was a field trip for the first graders scheduled on the day of the attack.

14

a police officer trainee was not covered under the applicable agreement in a civil action against him stemming from his involvement in a robbery and murder while he was driving his City police car. Id. at 77. The coverage agreement in that case defined "member" in part as an "[e]mployee . . . acting for and on behalf of the City and under its direction and control or appointed by the City while acting within the scope of [his] duties as such." (Punctuation omitted.) Id. at 79. In reversing the trial court's denial of summary judgment in favor of the appellant, we noted the similarities in language between the doctrine of respondeat superior and the coverage language, and concluded there was no coverage because the officer trainee was not acting "within the scope of his employment" when he participated in the robbery and murder "for *purely personal reasons* disconnected from the authorized business of the master." (Emphasis in original.) Id. at 80-81. In so holding, we determined that his status as an officer trainee alone was inadequate for purposes of evaluating coverage, but we must also look to the nature of his conduct at the time of the incident. Id. at 83. We further concluded that "under Georgia law, an employee who steps outside of his employment to participate in purely personal conduct exceeds the scope of his employment, even if his employment put him in a position to accomplish the act." Id.

Here, Royal argues that the Agreement does not require the school to have authorized Fedd's conduct in attacking Royal, nor that it required Fedd to have been acting as a volunteer at the time of the attack in order for coverage to apply.[6] To accept this interpretation would require us to conclude that the Agreement continuously provided coverage to Fedd regardless of the nature of her actions. Just as in *Godfrey*, Fedd's unprovoked criminal attack on Royal was voluntary and not one undertaken while she was acting on behalf of the school as a volunteer. *Godfrey*, 273 Ga. App. at 83. Concluding otherwise would not only require us to ignore the facts of this case and the Agreement's unambiguous language — that coverage applies only when an authorized volunteer is acting within the scope of their authorization by the named member — but also to accept the illogical result that the school somehow authorized Fedd's attack on Royal, and also intended to reward such criminal conduct by providing coverage under the Agreement. This we cannot do, as no clear reading of the Agreement equates to such a nonsensical result. Accordingly,

---

[6] Similarly, we are not persuaded by Royal's contention that the school authorized Fedd's criminal attack because some evidence suggested that the principal may have allowed Fedd to walk down the hall to the bathroom where the incident occurred.

16

the trial court erred by denying the Fund's summary judgment motion on this issue, as Fedd's unauthorized actions are not covered under the Agreement.

2. In light of our conclusion in Division 1, we do not reach the merits of the Fund's remaining arguments on appeal. We therefore reverse the trial court's denial of the Fund's summary judgment motion and remand the cases with instruction for the trial court to enter judgment in the Fund's favor.

*Judgments reversed and cases remanded with direction. Barnes, P. J., and Gobeil, J., concur.*